100 Cal.Rptr.2d 352 (2000)
24 Cal.4th 317
8 P.3d 1089
John GUZ, Plaintiff and Appellant,
v.
BECHTEL NATIONAL, INC., et al., Defendants and Respondents.
No. S062201.
Supreme Court of California.
October 5, 2000.
*357 Bianco & Murphy, Stephen M. Murphy, San Francisco; Quackenbush & Quackenbush and William C. Quackenbush, San Mateo, for Plaintiff and Appellant.
Thomas W. Osborne and Melvin Radowitz, Washington, Dist. of Col., for the American Association of Retired Persons as Amicus Curiae on behalf of Plaintiff and Appellant.
Paul, Hastings, Janofsky & Walker, Paul Grossman, Paul W. Cane, Jr., John C. Oakes, Los Angeles; Thelen, Marrin, Johnson & Bridges, Thelen Reid & Priest, Curtis A. Cole, Janet F. Bentley, Clarice
C. Liu, Michael Hallerud and Thomas M. McInerney, San Francisco, for Defendants and Respondents.
Gibson, Dunn & Crutcher, Pamela L. Hemminger and Kathleen M. Vanderziel, Los Angeles, for California Chamber of Commerce as Amicus Curiae on behalf of Defendants and Respondents.
Law Offices of Steven Drapkin and Steven Drapkin, Los Angeles, for the Employers Group as Amicus Curiae on behalf of Defendants and Respondents.
Lloyd C. Loomis, Los Angeles, for California Employment Law Council as Amicus Curiae on behalf of Defendants and Respondents.
BAXTER, J.
This case presents questions about the law governing claims of wrongful discharge from employment as it applies to an employer's motion for summary judgment. Plaintiff John Guz, a longtime employee of Bechtel National, Inc. (BNI), was released at age 49 when his work unit was eliminated and its tasks were transferred to another Bechtel office. Guz sued BNI and its parent, Bechtel Corporation (hereinafter collectively Bechtel), alleging age discrimination, breach of an implied contract to be terminated only for good cause, and breach of the implied covenant of good faith and fair dealing. The trial court granted Bechtel's motion for summary judgment and dismissed the action. In a split decision, the Court of Appeal reversed. The majority found that Bechtel had demonstrated no grounds to foreclose a trial on any of the claims asserted in the complaint.
Having closely reviewed the Court of Appeal's decision,[1] we reach the following conclusions:
*358 First, the Court of Appeal used erroneous grounds to reverse summary judgment on Guz's implied contract cause of action. The Court of Appeal found triable evidence (1) that Guz had an actual agreement, implied in fact, to be discharged only for good cause, and (2) that the elimination of Guz's work unit lacked good cause because Bechtel's stated reasona "downturn in ... workload"was not justified by the facts, and was, in truth, a pretext to discharge the unit's workers for poor performance without following the company's "progressive discipline" policy. We acknowledge a triable issue that Guz, like other Bechtel workers, had implied contractual rights under specific provisions of Bechtel's written personnel policies. But neither the policies, nor other evidence, suggests any contractual restriction on Bechtel's right to eliminate a work unit as it saw fit, even where dissatisfaction with unit performance was a factor in the decision. The Court of Appeal's ruling on Guz's implied contract claim must therefore be reversed. The Court of Appeal did not reach the additional ground on which Guz claims a contractual breachi.e., that Bechtel failed to follow its fair layoff policies when, during and after the reorganization, it made individual personnel decisions leading to Guz's release. Accordingly, we leave that issue to the Court of Appeal on remand.
Second, the Court of Appeal erred in restoring Guz's separate cause of action for breach of the implied covenant of good faith and fair dealing. Here Guz claims that even if his employment included no express or implied-in-fact agreement limiting Bechtel's right to discharge him, and was thus "at will" (Lab.Code, § 2922), the covenant of good faith and fair dealing, implied by law in every contract, precluded Bechtel from terminating him arbitrarily, as by failing to follow its own policies, or in bad faith. But while the implied covenant requires mutual fairness in applying a contract's actual terms, it cannot substantively alter those terms. If an employment is at will, and thus allows either party to terminate for any or no reason, the implied covenant cannot decree otherwise. Moreover, although any breach of the actual terms of an employment contract also violates the implied covenant, the measure of damages for such a breach remains solely contractual. Hence, where breach of an actual term is alleged, a separate implied covenant claim, based on the same breach, is superfluous. On the other hand, where an implied covenant claim alleges a breach of obligations beyond the agreement's actual terms, it is invalid.
Finally, we disagree with the Court of Appeal that Guz's claim of prohibited age discrimination has triable merit. Bechtel presented evidence, largely undisputed, that the reasons for its personnel decisions leading to Guz's release had nothing to do with his age. In the face of this showing, evidence cited by Guz that certain workers preferred over him were substantially younger is insufficient to permit a rational inference that age played any significant role in his termination.
For the reasons set forth above, we will reverse the judgment of the Court of Appeal and will remand to that court for further proceedings consistent with this opinion.

FACTS
In October 1994, Guz sued Bechtel, challenging the June 1993 termination of his Bechtel employment. The complaint alleged causes of action for breach of an implied employment contract (see Foley v. Interactive Data Corp. (1988) 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (Foley)), breach of the covenant of good faith and fair dealing, and age discrimination in violation of the California Fair Employment *359 and Housing Act (FEHA; Gov.Code, § 12941).
After extensive discovery, Bechtel filed a motion for summary judgment in August 1995. The motion, and Guz's opposition thereto, attached numerous supporting documents, including declarations and deposition excerpts. On the basis of these submissions, the following facts appear to be essentially undisputed:
In 1971, Bechtel hired Guz as an administrative assistant at a salary of $750 per month. Throughout his Bechtel career, Guz worked in "management information," performing, at various times, duties on both the "awarded" and "overhead" sides of this specialty. He received steady raises and promotions. His performance reviews were generally favorable, though his March 1992 evaluation indicated he needed to follow through on ideas and should become "fully computer literate in order to improve his long-term job success."
BNI, a division of Bechtel Corporation, is an engineering, construction, and environmental remediation company that focuses on federal government programs, principally for the Departments of Energy and Defense. Prior to 1993, BNI had its own in-house management information unit, the BNI Management Information Group (BNI-MI). BNI-MI itself represented a 1986 consolidation of two Bechtel management information units, which resulted in the work of these groups being done by fewer people. Between 1986 and 1991, BNI-MI's size was further reduced from 13 to six persons, and its costs were reduced from $748,000 in 1986 to $400,000 in 1991.
Guz had worked for BNI-MI since 1986. In 1992, at age 49, he was employed as a financial reports supervisor, responsible for supervising BNI-MI's overhead section, which included himself and 44-year-old Dee Minoia. At salary grade 27, Guz earned $5,940 per month. BNI-MI's six-member staff also included its manager, Ronald Goldstein (age 50), Goldstein's secretary Pam Fung (age 45), Robert Wraith (age 41), and Christine Siu (age 34). Guz's immediate superior was his longtime friend and colleague Goldstein. Goldstein, in turn, reported to Edward Dewey, BNI's manager of government services.
During this time, Bechtel maintained Personnel Policy 1101, dated June 1991, on the subject of termination of employment (Policy 1101). Policy 1101 stated that "Bechtel employees have no employment agreements guaranteeing continuous service and may resign at their option or be terminated at the option of Bechtel."
Policy 1101 also described several "Categories of Termination," including "Layoff and "Unsatisfactory Performance." With respect to Unsatisfactory Performance, the policy stated that "[e]mployees who fail to perform their jobs in a satisfactory manner may be terminated, provided the employees have been advised of the specific shortcomings and given an opportunity to improve their performance."[2] A layoff was defined as "a Bechtel-initiated termination[ ] of employees caused by a reduction in workload, reorganizations, changes in job requirements, or other circumstances ..." Under the Layoff policy, employees subject to termination for this reason "may be placed on `holding status' if there is a possible Bechtel assignment within the following 3-month period." Guz understood that Policy 1101 applied to him.
In January 1992, Robert Johnstone became president of BNI. While previously running another Bechtel entity, Johnstone had received management information services from the San Francisco Regional Office Management Information Group (SFRO-MI) headed by James Tevis. BNI-MI and SFRO-MI performed similar functions, and John Shaeffer,[3] a veteran *360 Bechtel employee who was several months older than Guz, had overhead reporting duties for SFRO-MI that were similar to Guz's job within BNI-MI.
Johnstone soon became unhappy with the size, cost, and performance of BNMI. In April 1992, he advised Dewey, Goldstein, and Guz that BNI-MI's work could be done by three people. A May 1992 memo from Dewey to Goldstein warned that Dewey and Johnstone had agreed BNI-MI's 1992 overhead budget of $365,000 was a "maximum not to be exceeded" and was "subject to further analysis and review, since the real guideline was far below this level."
Between April and October 1992, Guz and Goldstein discussed how to reduce BNI-MI's work force. In September 1992, Dee Minoia was told to look for another job. In October 1992, on Dewey's recommendation, Goldstein advised Guz to seek another Bechtel position, citing BNMI's reduced budget as the "biggest factor." By that time, as Guz knew, BNMI's overhead costs for 1992 had already run well over its strict budget.
In preparation for his departure, Guz compiled a list of his job tasks, together with his suggestions about who should perform his work once the BNI-MI staff was reduced. Guz recommended that most of his duties go to Shaeffer in SFRO-MI, and that the small remaining portion of his work, involving the government's Defense Contract Audit Agency, be transferred to a unit headed by Ann Dersheimer, BNI's 46-year-old controller, which regularly performed government audit and contract work. In mid-November, Goldstein managed to persuade Dewey, at least temporarily, that Guz was necessary to BNMI's work. With Dewey's consent, Goldstein asked Guz to stay, and Guz accepted.
Meanwhile, however, Dewey and Johnstone were discussing the possibility of involving SFRO-MI more actively in BNI's management information needs. In late November 1992, Goldstein received from Dewey, and discussed with Guz, a memo setting BNI-MI's target overhead budget for 1993 at $250,000. The memo again suggested staff reductions as a means of bringing the unit's overhead within the budget limits.
About the same time, Johnstone asked Tevis to submit a proposal to provide BNI's management information services through SFRO-MI. In early December, Tevis submitted a proposed budget of $200,000, which Johnstone accepted.
On December 9, 1992, Goldstein informed Guz that BNI-MI was being disbanded, that its work would be done by SFRO-MI, and that Guz was being laid off. Goldstein told Guz the reason he had been selected for layoff was to reduce costs. On December 11, 1992, Guz received a confirmatory letter from Dewey, which referred to "the downturn in our workload" and placed Guz on holding status. In a December 17, 1992, memo to BNI managers, Johnstone announced the transfer of BNI-MI to SFRO-MI effective February 1, 1993. During the transition period, as he had earlier recommended, Guz transferred his overhead reporting work to Shaeffer and his government audit work to Dersheimer.
As part of the transition plan, Tevis consulted with Goldstein "about the positions [Tevis] would need that [he] could cover in [his] group and that [he] couldn't cover." According to Tevis's uncontradicted deposition testimony, Goldstein recommended Wraith and Siu as the best additions to SFRO-MI's staff. The reasons, according to Tevis, were that Siu had necessary skills in Bechtel's ORS computer operating system and occupied a salary grade commensurate with the duties Tevis wished her to assume, and that Wraith "knew the project side" of management *361 information. Guz's name came up in the discussion, but Tevis and Goldstein "both decided" Shaeffer and another current SFRO-MI employee, Chris Gee, were sufficient to assume Guz's overhead work.
Wraith and Siu, the two youngest members of BNI-MI, were transferred to SFRO-MI, while all the remaining BNI-MI employees, including Guz, were laid off. Guz was placed on holding status pending possible reassignment to another Bechtel position.
During early 1993, while Guz was on holding status, three other positions became available in SFRO-MI, partly because of that unit's expanded responsibilities for BNI. An existing SFRO-MI employee, 42-year-old John Wallace, was selected for a new SFRO-MI position as supervisor of SFRO-MI's work for BNI. Wallace's former SFRO-MI subordinate, 52-year-old Jan Vreim, was placed in Wallace's old job. The third position, vacated by the transfer of another SFRO-MI member, was filled by 38year-old Barbara Stenho, who also already worked for Bechtel but was a newcomer to SFRO-MI.
Tevis explained that Wallace was selected for his position because it required his computer skills, and because his supervisory and project experience suited him for the responsibility of working directly with BNI president Johnstone, who was project oriented. Vreim was also chosen for her ORS computer ability, her history of working with high-level managers, and her project experience. The SFRO-MI position taken by Stenho required a close working relationship with another Bechtel entity, Bechtel Civil, where Stenho had previously been employed. Stenho was placed in her new job at the specific request of Bechtel Civil's manager.
Though Guz insists he let it be known he wanted to stay at Bechtel, even at a reduced salary, he appears to concede he did not specifically apply for any of the SFRO-MI positions. Tevis never saw Guz's resume before filling them, and he admitted he never considered Guz for these jobs. Tevis variously indicated he did not realize Guz was available, thought Guz "only did overhead," understood from Goldstein that Guz lacked computer skills, and did not know Guz had supervisory experience. Tevis also noted Guz did not have the Bechtel Civil relationship necessary for the Stenho position. After Tevis was asked, at his deposition, to examine Guz's resume, Tevis acknowledged it indicated Guz might have qualified for the positions taken by Wraith and Wallace.
Guz's original three-month holding status was renewed for an additional three months, but he obtained no other position within Bechtel. He was terminated on June 11, 1993.
Guz sought to furnish evidence that the cost reduction and workload downturn reasons given him for the elimination of BNMI, and his own consequent layoff, were arbitrary, false, and pretextual. To rebut the implication that a general business slowdown required BNI to lay off workers, Guz submitted an excerpt from Bechtel Corporation's 1992 Annual Report. There, Bechtel Corporation's president stated that the "Bechtel team had an exceptional year," and that the company as a whole had achieved healthy gains in both revenue from current projects and new work booked. In his own declaration, Goldstein stated that BNI-MI's 1992 and projected 1993 workload was high, that BNI-MI's work volume was not directly related to the overall job hours of BNI, and that because much of BNI-MI's overhead cost was recoverable under BNI's government contracts, the net savings from elimination of BNI-MI were only a small fraction of its budget.
Guz also submitted additional Bechtel documents discussing specific company personnel policies and practices, including those policies pertaining to laid-off employees. These documents included Bechtel's 1989 Reduction-in-Force Guidelines (RIF *362 Guidelines) and Bechtel's Personnel Policy 302 (Policy 302).
Policy 302 described a system of employee ranking (sometimes hereafter called force ranking), which was to be "used alone or in conjunction with other management tools in making personnel decisions in such areas as ... [staffing." Rankings were to be based on the fair, objective, and consistent evaluation of employees' comparative job-relevant skills and performance. However, Policy 302 also provided that "[u]nique situations may occur in which employee ranking may be inapplicable based on the nature of the personnel decision or the limited size of the ranking group." (Italics omitted.)
The RIF Guidelines specified that when choosing among employees to be retained and released during a reduction in force, the formal ranking system set forth in Policy 302 was to be employed. For this purpose, the RIF Guidelines said, employees should "[i]deally" be ranked, by similarity of function or level of work activity, in groups of from 20 to 100. The parties disputed whether Bechtel actually used this force ranking system when eliminating entire units of fewer than 20 employees. Bechtel's manager of human resources declared that force ranking was inappropriate for small units, such as BNI-MI, whose employees had dissimilar duties, grades, and skills. However, both Guz and Goldstein declared their recollection that force ranking was an established Bechtel policy and was used in 1986 when two management information units, containing 13 employees, were consolidated into a six-member unit, BNI-MI.
The RIF Guidelines also explained the term "holding status" and its benefits. According to the RIF Guidelines, this status could be granted upon layoff, for a renewable three-month period, while the employee awaited possible reassignment. The employee would not receive salary, but Bechtel would maintain his medical, dental, voluntary personal accident, and term life insurance. Bechtel should also provide the employee with "[t]ransfer and [placement [assistance." The "releasing organization" should determine if the employee was qualified for other vacant positions within the same unit, and "open requisitions" (i.e., solicitation of outside applicants for available positions) should generally be cancelled during a reduction in force. "Efforts should [also] be made to contact discipline counterparts in other Bechtel entities/services" in hopes of placing the employee, and the employee should be considered for future positions. (Italics added.) In his deposition, BNI president Johnstone agreed that Bechtel's practice was to place an employee on holding status prior to termination, to attempt to reassign the employee during this period, and to "continue to look for positions even after the employee has been laid off."[4]
In their declarations, Goldstein and Guz insisted Guz was qualified for each of the several vacant positions in SFRO-MI, as well as for several other positions that became available within Bechtel. Addressing Tevis's specific qualms about Guz, Guz and Goldstein declared that Guz had supervisorial experience and had worked on both the awarded and overhead sides of management information. Guz further stated that he had taken training for the ORS computer system, "had more than adequate computer skills for [his] position," and was never told his computer skills were deficient.
*363 The trial court granted summary judgment. The court reasoned that "[Guz] was an at-will employee and has not introduced any evidence that he was ever told at any time that he had permanent employment or that he would be retained as long as he was doing a good job.... [¶] Plaintiff is unable to establish a prima facie case of age discrimination.... Plaintiff is also unable to rebut [Bechtel's] legitimate business reason for his termination and/or his failure to obtain another position within Bechtel...."
Over a vigorous dissent by Presiding Justice Anderson, the Court of Appeal, First Appellate District, Division Four, reversed. The majority, Justices Poche and Reardon, reasoned as follows: Under Foley, supra, 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, Guz's longevity, promotions, raises, and favorable performance reviews, together with Bechtel's written progressive discipline policy and Bechtel officials' statements of company practices, raised a triable issue that Guz had an implied-in-fact contract to be dismissed only for good cause. There was evidence that Bechtel breached this term by eliminating BNI-MI, on the false ground that workload was declining, as a pretext to weed out poor performers without applying the company's progressive discipline procedures. As to Guz's age discrimination claim, Bechtel was required to advance a credible nondiscriminatory reason for Guz's termination, after which the burden shifted to Guz to produce evidence that the proffered reason was discriminatory or pretextual. As already noted, however, whether a downturn in workload was the real reason for Bechtel's action was in legitimate dispute. Hence, summary judgment on the age discrimination claim was improper.
The dissent argued that the trial court properly dismissed all Guz's causes of action. It reasoned as follows: As to the contract claim, Policy 1101 expressly provided that Bechtel employment was at will. The progressive discipline policy did not apply to general reductions in force, and nothing in Bechtel's personnel policies otherwise limited its right to eliminate positions. Guz's mere successful longevity could not prove a contractual right to be terminated only for good cause. Moreover, there was no evidence the elimination of BNI-MI was pretextual, or that Bechtel violated the implied covenant of fair dealing by engaging in intentional, bad faith conduct to deprive Guz of the benefits of his employment. As to age discrimination, Bechtel gave legitimate nondiscriminatory reasons for eliminating BNI-MI, and Guz presented no evidence these reasons were false, let alone excuses for intentional discrimination against Guz on the basis of his age.[5]
We granted review.

DISCUSSION[6]

I. Summary judgment rules.
On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. (Artiglio v. Coming Inc. (1998) 18 Cal.4th 604, 612, 76 Cal.Rptr.2d 479, 957 P.2d 1313.) Under California's traditional rules, we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiffs case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of *364 trial, such that the defendant is entitled to judgment as a matter of law. (E.g., Calvillo-Silva v. Home Grocery (1998) 19 Cal.4th 714, 735-736, 80 Cal.Rptr.2d 506, 968 P.2d 65 (Calvillo-Silva); Flatt v. Superior Court (1994) 9 Cal.4th 275, 279, 36 Cal.Rptr.2d 537, 885 P.2d 950; Ann M. v. Pacific Plaza Shopping Center (1993) 6 Cal.4th 666, 673-674, 25 Cal.Rptr.2d 137, 863 P.2d 207; Molko v. Holy Spirit Assn. (1988) 46 Cal.3d 1092, 1107, 252 Cal. Rptr. 122, 762 P.2d 46.)[7]

II. Implied contract claim.
Labor Code section. 2922 provides that "[a]n employment, having no specified term, may be terminated at the will of either party on notice to the other." An at-will employment may be ended by either party "at any time without cause," for any or no reason, and subject to no procedure except the statutory requirement of notice. (E.g., Foley, supra, 47 Cal.3d 654, 680, 254 Cal.Rptr. 211, 765 P.2d 373; Gantt v. Sentry Insurance (1992) 1 Cal.4th 1083, 1094, 4 Cal.Rptr.2d 874, 824 P.2d 680; Marin v. Jacuzzi (1964) 224 Cal. App.2d 549, 553-554, 36 Cal.Rptr. 880; see Crosier v. United Parcel Service, Inc. (1983) 150 Cal.App.3d 1132, 1137, 198 Cal. Rptr. 361.)[8]
While the statutory presumption of at-will employment is strong, it is subject to several limitations. For instance, as we have observed, "the employment relationship is fundamentally contractual." (Foley, supra, 47 Cal.3d 654, 696, 254 Cal.Rptr. 211, 765 P.2d 373.) Thus, though Labor Code section 2922 prevails where the employer and employee have reached no other understanding, it does not overcome their "fundamental ... freedom of contract" to depart from at-will employment. (47 Cal.3d at p. 677, 254 Cal.Rptr. 21.1, 765 P.2d 373.) The statute does not prevent the parties from agreeing to any limitation, otherwise lawful, on the *365 employer's termination rights. (Id at pp. 677, 680, 254 Cal.Rptr. 211, 765 P.2d 373.)
One example of a contractual departure from at-will status is an agreement that the employee will be terminated only for "good cause" (Foley, supra, 47 Cal.3d 654, 677, 254 Cal.Rptr. 211, 765 P.2d 373) in the sense of "`"a fair and honest cause or reason, regulated by good faith ..."' [citation], as opposed to one that is `trivial, capricious, unrelated to business needs or goals, or pretextual....' [Citations.]" (Scott v. Pacific Gas & Electric Co. (1995) 11 Cal.4th 454, 467, 46 Cal.Rptr.2d 427, 904 P.2d 834 (Scott); see also Cotran v. Rollins Hudig Hall Internal, Inc. (1998) 17 Cal.4th 93, 104-105, 69 Cal.Rptr.2d 900, 948 P.2d 412; Pugh v. See's Candies, Inc. (1981) 116 Cal.App.3d 311, 330, 171 Cal. Rptr. 917 (Pugh).) But the parties are free to define their relationship, including the terms on which it can be ended, as they wish. The parties may reach any contrary understanding, otherwise lawful, "concerning either the term of employment or the grounds or manner of termination." (Foley, supra, 47 Cal.3d at p. 680, 254 Cal.Rptr. 211, 765 P.2d 373, italics added.)
Thus, the employer and employee may enter "`an agreement ... that ... the employment relationship will continue indefinitely, pending the occurrence of some event such as the employer's dissatisfaction with the employee's services or the existence of some "cause" for termination.'" (Foley, supra, 47 Cal.3d 654, 680, 254 Cal.Rptr. 211, 765 P.2d 373, quoting Pugh, supra, 116 Cal.App.3d 311, 324-325, 171 Cal.Rptr. 917, italics added.) Among the many available options, the parties may agree that the employer's termination rights will vary with the particular circumstances. The parties may define for themselves what cause or causes will permit an employee's termination and may specify the procedures under which termination shall occur. The agreement may restrict the employer's termination rights to a greater degree in some situations, while leaving the employer freer to act as it sees fit in others.
The contractual understanding need not be express, but may be implied in fact, arising from the parties' conduct evidencing their actual mutual intent to create such enforceable limitations. (Foley, supra, 47 Cal.3d 654, 680, 254 Cal. Rptr. 211, 765 P.2d 373.) In Foley, we identified several factors, apart from express terms, that may bear upon "the existence and content of an ... [implied-infact] agreement" placing limits on the employer's right to discharge an employee. (Ibid., italics added.) These factors might include "`the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged.'" (Ibid., quoting Pugh, supra, 116 Cal.App.3d 311, 327, 171 Cal.Rptr. 917.)
Foley asserted that "the totality of the circumstances" must be examined to determine whether the parties' conduct, considered in the context of surrounding circumstances, gave rise to an implied-in-fact contract limiting the employer's termination rights. (Foley, supra, 47 Cal.3d 654, 681, 254 Cal.Rptr. 211, 765 P.2d 373.) We did not suggest, however, that every vague combination of Foley factors, shaken together in a bag, necessarily allows a finding that the employee had a right to be discharged only for good cause, as determined in court.
On the contrary, "courts seek to enforce the actual understanding" of the parties to an employment agreement. ((Foley, supra, 47 Cal.3d 654, 677, 254 Cal. Rptr. 211, 765 P.2d 373, italics added.) Whether that understanding arises from express mutual words of agreement, or from the parties' conduct evidencing a similar meeting of minds, the exact terms to which the parties have assented deserve equally precise scrutiny. As Foley indicated, *366 it is the "nature of [an implied-in-fact] contract" that must be determined from the "totality of the circumstances." (Id., at p. 681, 254 Cal.Rptr. 211, 765 P.2d 373.)
Every case thus turns on its own facts. Where there is no express agreement, the issue is whether other evidence of the parties' conduct has a "tendency in reason" (Evid.Code, § 210) to demonstrate the existence of an actual mutual understanding on particular terms and conditions of employment. If such evidence logically permits conflicting inferences, a question of fact is presented. (Foley, supra, 47 Cal.3d at p. 677, 254 Cal.Rptr. 211, 765 P.2d 373.) But where the undisputed facts negate the existence or the breach of the contract claimed, summary judgment is proper.
Guz alleges he had an agreement with Bechtel that he would be employed so long as he was performing satisfactorily and would be discharged only for good cause. Guz claims no express understanding to this effect. However, he asserts that such an agreement can be inferred by combining evidence of several Foley factors, including (1) his long service; (2) assurances of continued employment in the form of raises, promotions, and good performance reviews; (3) Bechtel's written personnel policies, which suggested that termination for poor performance would be preceded by progressive discipline, that layoffs during a work force reduction would be based on objective criteria, including formal ranking, and that persons laid off would receive placement and reassignment assistance; and (4) testimony by a Bechtel executive that company practice was to terminate employees for a good reason and to reassign, if possible, a laid-off employee who was performing satisfactorily.
Guz further urges there is evidence his termination was without good cause in two respects. First, he insists, the evidence suggests Bechtel had no good cause to eliminate BNI-MI, because the cost reduction and workload downturn reasons Bechtel gave for that decision (1) were not justified by the facts, and (2) were a pretext to terminate him and other individual BNI-MI employees for poor performance without following the company's progressive discipline rules. Second, Guz asserts, even if there was good cause to eliminate his work unit, his termination nonetheless lacked good cause because Bechtel failed to accord him fair layoff rights set forth in its written personnel rules, including (1) use of objective force ranking to determine which unit members deserved retention, and (2) fair consideration for other available positions while he was in holding status.
The Court of Appeal agreed with Guz that there was triable evidence of an implied-in-fact contract to terminate him only for good cause. The court further agreed the evidence warranted a trial on Guz's first theory of breach, i.e., that Bechtel's stated economic reason for eliminating his work unit lacked support and was a pretext for firing unsatisfactory workers without resort to progressive discipline procedures. On this basis alone, the Court of Appeal reversed the summary judgment against Guz's contract cause of action. The Court of Appeal did not decide whether the evidence justified a trial on Guz's second theory of breach, i.e., the denial of rights specified by the company's fair layoff rules.
As we shall explain, we find triable evidence that Bechtel's written personnel documents set forth implied contractual limits on the circumstances under which Guz, and other Bechtel workers, would be terminated. On the other hand, we see no triable evidence of an implied agreement between Guz and Bechtel on additional, different, or broader terms of employment security. As Bechtel suggests, the personnel documents themselves did not restrict Bechtel's freedom to reorganize, reduce, and consolidate its work force for whatever reasons it wished. Thus, contrary to the Court of Appeal's holding, Bechtel had the absolute right to *367 eliminate Guz's work unit and to transfer the unit's responsibilities to another company entity, even if the decision was influenced by dissatisfaction with the eliminated unit's performance, and even if the personnel documents entitled an individual employee to progressive discipline procedures before being fired for poor performance.
The basis on which the Court of Appeal overturned this portion of the trial court's summary judgment was therefore erroneous, and the Court of Appeal's decision in this regard must be reversed. Having so concluded, we need not address the issue the Court of Appeal never reached, i.e., whether Guz has a triable claim that, in the course of the reorganization, Bechtel denied him fair layoff protections, such as objective ranking and placement assistance, as guaranteed by the company's written personnel provisions. We leave that question to the Court of Appeal on remand. The following paragraphs describe in detail our reasoning on these matters.
At the outset, Bechtel insists that the existence of implied contractual limitations on its termination rights is negated because Bechtel expressly disclaimed all such agreements. Bechtel suggests the at-will presumption of Labor Code 2922 was conclusively reinforced by language Bechtel inserted in Policy 1101, which specified that the company's employees "have no ... agreements guaranteeing continuous service and may be terminated at [Bechtel's] option." As Bechtel points out, Guz concedes he understood Policy 1101 applied to him.[9]
This express disclaimer, reinforced by the statutory presumption of at-will employment, satisfied Bechtel's initial burden, if any, to show that Guz's claim of a contract limiting Bechtel's termination rights had no merit. But neither the disclaimer nor the statutory presumption necessarily foreclosed Guz from proving the existence and breach of such an agreement.
Cases in California and elsewhere have held that at-will provisions in personnel handbooks, manuals, or memoranda do not bar, or necessarily overcome, other evidence of the employer's contrary intent (see, e.g., Thomka v. Financial Corp. (1993) 15 Cal.App.4th 877, 884-885, 19 Cal. Rptr.2d 382; Walker v. Blue Cross of California (1992) 4 Cal.App.4th 985, 993, 6 Cal.Rptr.2d 184 (Walker); Wilkerson v. Wells Fargo Bank (1989) 212 Cal.App.3d 1217, 1227-1228, 261 Cal.Rptr. 185 (Wilkerson)), particularly where other provisions in the employer's personnel documents themselves suggest limits on the employer's termination rights (see, e.g., Wood v. Loyola Marymount University (1990) 218 Cal.App.3d 661, 665-669, 267 Cal.Rptr. 230; Zaccardi v. Zale Corp. (10th Cir.1988) 856 F.2d 1473, 1476-1477; O'Loughlin v. The Pritchard Corp. (D.Kan.1997) 972 F.Supp. 1352, 1369-1370; Famum v. Brattleboro Retreat, Inc. (1995) 164 Vt. 488, 671 A.2d 1249, 1254-1255; Swanson v. Liquid Air Corp. (1992) 118 Wash.2d 512, 826 P.2d 664, 668-677; Jones v. Central Peninsula General Hosp. (Alaska 1989) 779 P.2d 783, 788).[10] The reasoning *368 express or implied, is that parol evidence is admissible to explain, supplement, or even contradict the terms of an unintegrated agreement, and that handbook disclaimers should not permit an employer, at its whim, to repudiate promises it has otherwise made in its own self-interest, and on which it intended an employee to rely.
We agree that disclaimer language in an employee handbook or policy manual does not necessarily mean an employee is employed at will. But even if a handbook disclaimer is not controlling (Wilkerson, supra, 212 Cal.App.3d 1217, 1227, 261 Cal.Rptr. 185) in every case, neither can such a provision be ignored in determining whether the parties' conduct was intended, and reasonably understood, to create binding limits on an employer's statutory right to terminate the relationship at will. Like any direct expression of employer intent, communicated to employees and intended to apply to them, such language must be taken into account, along with all other pertinent evidence, in ascertaining the terms on which a worker was employed. (Ibid.)[11] We examine accordingly the evidence cited by Guz in support of his implied contract claim.
At the outset, it is undisputed that Guz received no individual promises or representations that Bechtel would retain him except for good cause, or upon other specified circumstances. (See Foley, supra, 47 Cal.3d 654, 680, 254 Cal.Rptr. 211, 765 P.2d 373.) Nor does Guz seriously claim that the practice in Bechtel's industry was to provide secure employment. (Ibid.) Indeed, the undisputed evidence suggested that because Bechtel, like other members of its industry, operated by competitive bidding from project to project, its work force fluctuated widely and, in terms of raw numbers, was in general decline.[12]
However, Guz insists his own undisputed long and successful service at Bechtel constitutes strong evidence of an implied contract for permanent employment except upon good cause. Guz argues that by retaining him for over 20 years, and by providing him with steady raises, promotions, commendations, and *369 good performance reviews during his tenure, Bechtel engaged in "actions ... reflecting assurances of continued employment." (Foley, supra, 47 Cal.3d 654, 680, 254 Cal.Rptr. 211, 765 P.2d 373.) Bechtel responds that an individual employee's mere long and praiseworthy service has little or no tendency to show an implied agreement between the parties that the employee is no longer terminable at will.
A number of post-Foley California decisions have suggested that long duration of service, regular promotions, favorable performance reviews, praise from supervisors, and salary increases do not, without more, imply an employer's contractual intent to relinquish its at-will rights. (Horn v. Cushman & Wakefield Western, Inc. (1999) 72 Cal.App.4th 798, 817-819, 85 Cal. Rptr.2d 459 (Horn); Kovatch v. California Casualty Management Co. (1998) 65 Cal.App.4th 1256, 1276, 77 Cal.Rptr.2d 217; Davis v. Consolidated Freightways (1994) 29 Cal.App.4th 354, 368, 34 Cal.Rptr.2d 438; Tollefson, supra, 219 Cal.App.3d 843, 856, 268 Cal.Rptr. 550; Miller v. Pepsi-Cola Bottling Co. (1989) 210 Cal.App.3d 1554, 1559, 259 Cal.Rptr. 56; see also Hoy v. Sears, Roebuck & Co. (N.D.Cal.1994) 861 F.Supp. 881, 886.) These decisions reason that such events are but natural consequences of a well-functioning employment relationship, and thus have no special tendency to prove that the employer's at-will implied agreement, reasonably understood as such by the employee, has become one that limits the employer's future termination rights.
We agree that an employee's mere passage of time in the employer's service, even where marked with tangible indicia that the employer approves the employee's work, cannot alone form an implied-in-fact contract that the employee is no longer at will. Absent other evidence of the employer's intent, longevity, raises and promotions are their own rewards for the employee's continuing valued service; they do not, in and of themselves, additionally constitute a contractual guarantee of future employment security. A rule granting such contract rights on the basis of successful longevity alone would discourage the retention and promotion of employees.
On the other hand, long and successful service is not necessarily irrelevant to the existence of such a contract. Over the period of an employee's tenure, the employer can certainly communicate, by its written and unwritten policies and practices, or by informal assurances, that seniority and longevity do create rights against termination at will. The issue is whether the employer's words or conduct, on which an employee reasonably relied, gave rise to that specific understanding.
Read in context, Foley, supra, 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, did not hold otherwise. In the first place, Foley's reference to lengthy, successful service as evidence of an implied contract not to terminate at will was simply quoted, with little independent analysis, from Pugh supra, 116 Cal.App.3d 311, 328, 171 Cal.Rptr. 917. Pugh, in turn, had adopted wholesale the reasoning of Cleary v. American Airlines, Inc. (1980) 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (Cleary) that "`[termination of employment without legal cause [after long service] offends the implied-in-law covenant of good faith and fair dealing contained in all contracts, including employment contracts.'" (Pugh, supra, 116 Cal.App.3d at p. 328, 171 Cal. Rptr. 917, quoting Cleary, supra, 111 Cal. App.3d at p. 455, 168 Cal.Rptr. 722, italics added.) In other words, these cases suggested, because the arbitrary termination of a veteran employee is neither fair nor in good faith, such conduct violates the implied covenant contained in every employment contract, regardless of its terms.
But Foley itself discredited this line of reasoning. There we "reiterated that the employment relationship is fundamentally contractual" (Foley, supra, 47 Cal.3d 654, 696, 254 Cal.Rptr. 211, 765 P.2d 373), and we made clear that the implied covenant of *370 good faith and fair dealing cannot supply limitations on termination rights to which the parties have not actually agreed. (Foley, supra, at p. 698, fn. 39, 254 Cal.Rptr. 211, 765 P.2d 373; see also discussion, post.)
Insofar as Foley applied the long service factor to its own facts, it did so consistent with the principles of implied-in-fact contracts. In Foley, the employer claimed the employee's six years and nine months of service was too short a period to evidence an implied agreement not to discharge at will. We answered that "[l]ength of employment [was] a relevant consideration" and the plaintiffs length of service was "sufficient time for conduct to occur on which a trier of fact could find the existence of an implied contract." ((Foley, supra, 47 Cal.3d 654, 681, 254 Cal. Rptr. 211, 765 P.2d 373, italics added.)[13] Prominent among the conduct alleged by the Foley plaintiff was "repeated oral assurances of job security." (Foley, supra, 47 Cal.3d at p. 681, 254 Cal.Rptr. 211, 765 P.2d 373, italics added.)
We therefore decline to interpret Foley as holding that long, successful service, standing alone, can demonstrate an implied-in-fact contract right not to be terminated at will. In the case before us, there is no indication that employee longevity is a significant factor in determining the existence or content of an implied contract limiting the employer's termination rights. Guz claims no particular "`actions or communications by [Bechtel]'" (Foley, supra, 47 Cal.3d 654, 680, 254 Cal.Rptr. 211, 765 P.2d 373), and no industry customs, practices, or policies (ibid.), which suggest that by virtue of his successful longevity in Bechtel's employ, he had earned a contractual right against future termination at will.
If anything, Bechtel had communicated otherwise. The company's Policy 1101 stated that Bechtel employees had no contracts guaranteeing their continuous employment and could be terminated at Bechtel's option. Nothing in this language suggested any exception for senior workers, or for those who had received regular raises and promotions. While occasional references to seniority appear in other sections of Bechtel's personnel documents, the narrow context of these references undermines an inference that Bechtel additionally intended, or employees had reason to expect, special immunities from termination based on their extended or successful service.[14]
Accordingly, the undoubted length and merit of Guz's Bechtel career does not *371 bolster his claim that his at-will status had been altered by an implied contract. We must look elsewhere for evidence raising a triable issue that Bechtel entered and breached an implied contract limiting its right to terminate Guz's employment.
Guz asserts that Bechtel's personnel documents, read as a whole, strongly support his claim of an implied agreement for employment security. As Guz suggests, an employer's written personnel policies may be an important source of implied-contract evidence. We have made clear that "the trier of fact can infer an agreement to limit the grounds for termination based on the employee's reasonable reliance on the company's personnel manual or policies." Foley, supra, 47 Cal.3d 654, 681-682, 254 Cal.Rptr. 211, 765 P.2d 373.)
"The principle that implied employment contract terms may arise from the employer's official ... policies and practices is one that long predates Foley.... `Of late years the attitude of the courts (as well as of employers in general) is to consider regulations of this type which offer additional advantages to employees as being in effect offers of a unilateral contract which offer is accepted if the employee continues in the employment, and not as being mere offers of gifts.' ([Chinn v. China Nat. Aviation Corp. (1955) 138 Cal.App.2d 98,] 99-100 [291 P.2d 91]; see also Newberger v. Rifkind (1972) 28 Cal.App.3d 1070, 1076 [104 Cal.Rptr. 663] [implied unilateral contract for stock option agreement]; Hunter v. Sparling (1948) 87 Cal.App.2d 711, 721-722 [197 P.2d 807] [enforceable promise to pay pension benefits inferred from personnel policies].) In Hepp v. Lockheed-California Co. (1978) 86 Cal.App.3d 714 [150 Cal.Rptr. 408], this reasoning was extended to policies regarding nonmonetary employment benefits. There the court held that it was a question of fact whether an employer's [written] policy of preferential hiring for its laid-off employees was to be considered an implied contractual promise on which its employees could reasonably rely. (Id., at p. 719 [150 Cal.Rptr. 408].)" (Scott, supra, 11 Cal.4th 454, 464, 46 Cal. Rptr.2d 427, 904 P.2d 834.)
When an employer promulgates formal personnel policies and procedures in handbooks, manuals, and memoranda disseminated to employees, a strong inference may arise that the employer intended workers to rely on these policies as terms and conditions of their employment, and that employees did reasonably so rely. (See, e.g., Scott, supra, 11 Cal.4th 454, 465, 46 Cal.Rptr.2d 427, 904 P.2d 834.) Both parties derive benefits from such an arrangement. From the employees' perspective, formal policies promote fairness and consistency, guarding against the arbitrary, capricious, and incongruous treatment of similar cases. By the same token, such policies may also help the employer by enhancing worker morale, loyalty, and productivity, providing competitive advantage in the labor market, and minimizing employee litigation. (See id., at pp. 469-70, 46 Cal.Rptr.2d 427, 904 P.2d 834; see also Foley, supra, 47 Cal.3d 654, 681, 254 Cal.Rptr. 211, 765 P.2d 373.)
For these reasons, logic suggests that the employer may intend, and employees may understand, such generally promulgated policies as a systematic approach to personnel relations, providing a clear and uniform alternative to haphazard practices, understandings, and arrangements within the company. Therefore, where the employer has chosen to maintain such written policies, the terms they describe must be a central focus of the contractual analysis.
Finally, Guz asserts there is evidence that, industry custom and written company personnel policies aside, Bechtel had an unwritten "polic[y] or practice[ ]" (Foley, supra, 47 Cal.3d 654, 680, 254 Cal. Rptr. 211, 765 P.2d 373) to release its employees only for cause. As the sole evidence of this policy, Guz points to the deposition testimony of Johnstone, BNI's president, who stated his understanding that Bechtel terminated workers only with "good reason" or for "lack of [available] *372 work." But there is no evidence that Bechtel employees were aware of such an unwritten policy, and it flies in the face of Bechtel's general disclaimer. This brief and vague statement, by a single Bechtel official, that Bechtel sought to avoid arbitrary firings is insufficient as a matter of law to permit a finding that the company, by an unwritten practice or policy on which employees reasonably relied, had contracted away its right to discharge Guz at will.
In sum, if there is any significant evidence that Guz had an implied contract against termination at will, that evidence flows exclusively from Bechtel's written personnel documents. It follows that there is no triable issue of an implied contract on terms broader than the specific provisions of those documents. In reviewing the Court of Appeal's determination that Bechtel may have breached contractual obligations to Guz by eliminating his work unit, we must therefore focus on the pertinent written provisions.
As noted above, Bechtel's written personnel provisions covering termination from employment fell into two categories. The parties do not dispute that certain of these provisions, expressly denominated "Policies" (including Policies 1101 and 302), were disseminated to employees and were intended by Bechtel to inform workers of rules applicable to their employment. There seems little doubt, and we conclude, a triable issue exists that the specific provisions of these Policies did become an implicit part of the employment contracts of the Bechtel employees they covered, including Guz.
Guz also points to another Bechtel document, the RIF Guidelines, that addressed procedures for implementing reductions in the work force. Evidence suggesting the contractual status of this document is somewhat closer. On the one hand, the "Guidelines" label and evidence indicating this document was distributed primarily to supervisors for their use, weigh against an inference that Bechtel intended a widely disseminated policy on which employees might directly rely. (See, e.g., Knights v. Hewlett Packard (1991) 230 Cal.App.3d 775, 780, 281 Cal.Rptr. 295.) Moreover, there was some evidence that even some Bechtel managers were unaware of the force ranking system set forth in Policy 302 and the RIF Guidelines.
On the other hand, the formality, tone, length, and detail of the RIF Guidelines suggest they were not intended as merely precatory. The RIF Guidelines comprised a minimum of six single-spaced pages, and were distributed under a cover letter suggesting that they represented "corporate policy." In some instances, the RIF Guidelines defined or supplemented terms and provisions directly set forth in Policies 302 and 1101, such as the holding status described in Policy 1101 and the formal personnel ranking system described in Policy 302. There was also some evidence that Bechtel employees, including Guz, were aware of RIF Guideline procedures such as force ranking, had observed that the company followed these procedures in the past, and believed them to be Bechtel's policy. Goldstein, Guz's supervisor at BNI-MI, declared that as a supervisor, he received and was "instructed to follow" the RIF Guidelines. On balance, we are persuaded a triable issue exists that the RIF Guidelines, like the formally denominated Policies, formed part of an implied contract between Bechtel and its employees.
As Bechtel stresses, Policy 1101 itself purported to disclaim any employment security rights. However, Bechtel had inserted other language, not only in Policy 1101 itself, but in other written personnel documents, which described detailed rules and procedures for the termination of employees under particular circumstances. Moreover, the specific language of Bechtel's disclaimer, stating that employees had no contracts "guaranteeing ... continuous service" (italics added) and were terminable at Bechtel's "option," did not foreclose an understanding between Bechtel and all its workers that Bechtel would make its *373 termination decisions within the limits of its written personnel rules. Given these ambiguities, a fact finder could rationally determine that despite its general disclaimer, Bechtel had bound itself to the specific provisions of these documents.
In holding that Bechtel may have breached the terms of an implied contract with Guz by eliminating his work unit, the Court of Appeal relied on two premises. Focusing on one reason Guz was given for this decisiona "downturn in ... workload"the Court of Appeal concluded that even if this reason were taken at face value, the evidence permitted a determination that it was arbitrary and unreasonable, and thus without good cause, because it lacked support in the facts. Second, the Court of Appeal found triable evidence that this stated reason was pretextual, in that it masked Bechtel's true purpose to dismiss BNI-MI's workers on the basis of the unit's poor performance, but without affording each member the benefit of the progressive discipline rules set forth in the company's personnel documents.
On the facts before us, we conclude that both these premises were in error. Bechtel's written personnel documentswhich, as we have seen, are the sole source of any contractual limits on Bechtel's rights to terminate Guzimposed no restrictions upon the company's prerogatives to eliminate jobs or work units, for any or no reason, even if this would lead to the release of existing employees such as Guz.
Policy 1101 itself did address a category of termination labeled "Layoff." However, this section simply defined that term as a "Bechtel-initiated termination[ ] of employees caused by a reduction in workload, reorganizations, changes in job requirements, or other circumstances such as failure to meet [a] client's site access requirements." (Italics added.) Policy 1101 further provided that persons scheduled for layoff were entitled to advance notice to facilitate reassignment efforts and job search assistance, and that "[a] surplus employee[ ] [might] be placed on `holding status' if there [was] a possible Bechtel reassignment within the following 3-month period." By proceeding in this fashion, Policy 1101 confirmed that Bechtel was free to "reorganiz[e]" itself, or to "change[ ] ... job requirements," and to "initiate[ ]" employee "terminations ... caused by" this process, so long as Bechtel provided the requisite advance notice.
The RIF Guidelines set forth more detailed procedures for selecting individual layoff candidates, and for helping such persons obtain jobs elsewhere within the company. But the RIF Guidelines, like the Policies, neither stated nor implied any limits on Bechtel's freedom to implement the reorganization itself.
Guz, like the Court of Appeal, focuses on a separate section of Policy 1101, titled "Unsatisfactory Performance." This section, the so-called progressive discipline provision, stated that "[e]mployees who fail to perform their jobs in a satisfactory manner may be terminated, provided the employees have been advised of the specific shortcomings and given an opportunity to improve their performance." (Italics added.) Like the Court of Appeal, Guz cites BNI president Johnstone's disclosure that he was unhappy with BNI-MI's work product as evidence that the elimination of BNI-MI was a pretext for firing its individual members without resort to the progressive discipline policy.
However, as Bechtel suggests, Policy 1101 cannot reasonably be construed to conflate the separate Unsatisfactory Performance and Layoff provisions in this manner. Whatever rights Policy 1101 gave an employee threatened with replacement on account of his or her individual poor performance, we see nothing in Bechtel's personnel documents which, despite Bechtel's general disclaimer, limited Bechtel's prerogative to eliminate an entire work unit, and thus its individual jobs, even if the decision was influenced by a belief that the unit's work would be better *374 performed elsewhere within the company.[15]
Accordingly, we conclude the Court of Appeal erred in finding, on the grounds it stated, that Guz's implied contract claim was triable. Insofar as the Court of Appeal used these incorrect grounds to overturn the trial court's contrary determination, and thus to reinstate Guz's contractual cause of action, the Court of Appeal's decision must be reversed.
The Court of Appeal did not address Guz's second theory, i.e., that Bechtel also breached its implied contract by failing, during and after the reorganization, to provide him personally with the fair layoff protections, including force ranking and reassignment help, which are set forth in its Policies and RIF Guidelines. This theory raises difficult questions, including what the proper remedy, if any, should be if Guz ultimately shows that Bechtel breached a contractual obligation to follow certain procedural policies in the termination process. However, we commonly decline to decide issues not addressed by the Court of Appeal. (See, e.g., Hughes v. Board of Architectural Examiners (1998) 17 Cal.4th 763, 795, 72 Cal.Rptr.2d 624, 952 P.2d 641.) We will follow that practice here. On remand, the Court of Appeal should confront this issue and should determine whether Guz has raised a triable issue on this theory.

III. Implied covenant claim.
Bechtel next urges that the trial court properly dismissed Guz's separate claim for breach of the implied covenant of good faith and fair dealing because, on the facts and arguments presented, this theory of recovery is either inapplicable or superfluous. We agree.[16]
*375 The sole asserted basis for Guz's implied covenant claim is that Bechtel violated its established personnel policies when it terminated him without a prior opportunity to improve his "unsatisfactory" performance, used no force ranking or other objective criteria when selecting him for layoff, and omitted to consider him for other positions for which he was qualified. Guz urges that even if his contract was for employment at will, the implied covenant of good faith and fair dealing precluded Bechtel from "unfairly" denying him the contract's benefits by failing to follow its own termination policies.
Thus, Guz argues, in effect, that the implied covenant can impose substantive terms and conditions beyond those to which the contract parties actually agreed. However, as indicated above, such a theory directly contradicts our conclusions in Foley, supra, 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373. The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made. (E.g., Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 36, 44 Cal.Rptr.2d 370, 900 P.2d 619.) The covenant thus cannot "`be endowed with an existence independent of its contractual underpinnings.'" (Ibid., quoting Love v. Fire Ins. Exchange (1990) 221 Cal.App.3d 1136, 1153, 271 Cal.Rptr. 246.) It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.
Labor Code section 2922 establishes the presumption that an employer may terminate its employees at will, for any or no reason. A fortiori, the employer may act peremptorily, arbitrarily, or inconsistently, without providing specific protections such as prior warning, fair procedures, objective evaluation, or preferential reassignment. Because the employment relationship is "fundamentally contractual" (Foley, supra, 47 Cal.3d 654, 696, 254 Cal. Rptr. 211, 765 P.2d 373), limitations on these employer prerogatives are a matter of the parties' specific agreement, express or implied in fact. The mere existence of an employment relationship affords no expectation, protectible by law, that employment will continue, or will end only on certain conditions, unless the parties have actually adopted such terms. Thus if the employer's termination decisions, however arbitrary, do not breach such a substantive contract provision, they are not precluded by the covenant.
This logic led us to emphasize in Foley that "breach of the implied covenant cannot logically be based on a claim that [the] discharge [of an at-will employee] was made without good cause." (Foley, supra, 47 Cal.3d 654, 698, fn. 39, 254 Cal. Rptr. 211, 765 P.2d 373.) As we noted, "[b]ecause the implied covenant protects only the parties' right to receive the benefit of their agreement, and, in an at-will relationship there is no agreement to terminate only for good cause, the implied covenant standing alone cannot be read to impose such a duty. [Citation.]" (Ibid.)
The same reasoning applies to any case where an employee argues that even if his employment was at will, his arbitrary dismissal frustrated his contract benefits and thus violated the implied covenant of good faith and fair dealing. Precisely because employment at will allows the employer freedom to terminate the relationship as it chooses, the employer does not frustrate the employee's contractual rights merely by doing so. In such a case, "the employee cannot complain about a deprivation of the benefits of continued employment, for the agreement never provided for a continuation of its benefits in the first instance." (Hejmadi v. AMFAC, Inc. (1988) 202 Cal.App.3d 525, 547, 249 Cal. Rptr. 5.)
*376 Guz cites several decisions suggesting that the implied covenant precludes an employer from terminating even an at-will employee unfairly, such as by refusing to follow its own established policies and practices. (Rulon-Miller v. International Business Machines Corp. (1984) 162 Cal. App.3d 241, 247, 208 Cal.Rptr. 524 (Rulon-Miller) [employer's duty of fair dealing requires that "like cases be treated alike"; thus, employer's termination rules and regulations, if any, must be followed]; see Gray, supra, 181 Cal.App.3d 813, 820-821, 226 Cal.Rptr. 570 [long service plus violation of employer policies may establish breach of covenant of "fair treatment"]; Khanna, supra, 170 Cal.App.3d 250, 262, 215 Cal.Rptr. 860 [implied covenant may be violated by termination of at-will employee where employer engaged in bad faith actions, extraneous to the contract, to frustrate benefits of employment]; Pugh, supra, 116 Cal.App.3d 311, 327-329, 171 Cal.Rptr. 917 [termination after long service, in violation of employer policies, may breach implied covenant to refrain from arbitrary treatment]; Cleary, supra, 111 Cal.App.3d 443, 455-456, 168 Cal.Rptr. 722 [same]; see also Kern v. Levolor Lorentzen, Inc. (9th Cir.1990) 899 F.2d 772, 777 [covenant requires "cooperation in carrying out the contract and honesty in creating or settling disputes"; breach of covenant may thus be shown where employee establishes lengthy satisfactory service and violation of employer's termination policies].) But insofar as these authorities suggest that the implied covenant may impose limits on an employer's termination rights beyond those either expressed or implied in fact in the employment contract itself, they contravene the persuasive reasoning of Foley, and are therefore disapproved.
Similarly at odds with Foley are suggestions that independent recovery for breach of the implied covenant may be available if the employer terminated the employee in "bad faith" or "without probable cause," i.e., without determining "honestly and in good faith that good cause for discharge existed." (Walker, supra, 4 Cal. App.4th 985, 997, 6 Cal.Rptr.2d 184; see also, e.g., Wilkerson, supra, 212 Cal. App.3d 1217, 1231, 261 Cal.Rptr. 185; Burton v. Security Pacific Nat. Bank (1988) 197 Cal.App.3d 972, 979, 243 Cal.Rptr. 277; Rulon-Miller, supra, 162 Cal.App.3d 241, 253, 208 Cal.Rptr. 524.) Where the employment contract itself allows the employer to terminate at will, its motive and lack of care in doing so are, in most cases at least, irrelevant. (But see fn. 18, post.)
A number of Court of Appeal decisions since Foley have recognized that the implied covenant of good faith and fair dealing imposes no independent limits on an employer's prerogative to dismiss employees. (E.g., Camp, supra, 35 Cal. App.4th 620, 631, 41 Cal.Rptr.2d 329 [implied covenant did not preclude unfair termination where there was no express or implied-in-fact contract limiting employer's termination rights]; Flait v. North American Watch Corp. (1992) 3 Cal.App.4th 467, 480-481, 4 Cal.Rptr.2d 522 [employment contract contained express at-will term; because employee thus could not show her termination broke any "contractual covenant or promise," implied covenant claim must fail]; Slivinsky v. Watkins-Johnson Co. (1990) 221 Cal.App.3d 799, 806, 270 Cal.Rptr. 585 [where contract contained express at-will clause, implied covenant claim must fail because employee could not show her termination without good cause frustrated "the [parties'] intentions and reasonable expectations ... within the contract"].) We affirm that this is the law.[17]
Of course, as we have indicated above, the employer's personnel policies and practices *377 may become implied-in-fact terms of the contract between employer and employee. If that has occurred, the employer's failure to follow such policies when terminating an employee is a breach of the contract itself.
A breach of the contract may also constitute a breach of the implied covenant of good faith and fair dealing. But insofar as the employer's acts are directly actionable as a breach of an implied-in-fact contract term, a claim that merely realleges that breach as a violation of the covenant is superfluous. This is because, as we explained at length in Foley, the remedy for breach of an employment agreement, including the covenant of good faith and fair dealing implied by law therein, is solely contractual. In the employment context, an implied covenant theory affords no separate measure of recovery, such as tort damages. (Foley, supra, 47 Cal.3d 654, 682-700, 254 Cal.Rptr. 211, 765 P.2d 373.) Allegations that the breach was wrongful, in bad faith, arbitrary, and unfair are unavailing; there is no tort of "bad faith breach" of an employment contract.
We adhere to these principles here. To the extent Guz's implied covenant cause of action seeks to impose limits on Bechtel's termination rights beyond those to which the parties actually agreed, the claim is invalid. To the extent the implied covenant claim seeks simply to invoke terms to which the parties did agree, it is superfluous. Guz's remedy, if any, for Bechtel's alleged violation of its personnel policies depends on proof that they were contract terms to which the parties actually agreed. The trial court thus properly dismissed the implied covenant cause of action.[18]

IV. Age discrimination claim.
Bechtel urges that the trial court correctly granted summary adjudication against Guz's claim that he was terminated because of his age, in violation of the FEHA.[19] Bechtel contends that, in order to survive summary judgment, Guz was obliged to demonstrate a prima facie case of discrimination, but could not do so because it is undisputed that the bulk of his duties were assumed by an older employee. Alternatively, Bechtel insists it proffered a legitimate, nondiscriminatory reason for Guz's termination, i.e., a reduction in force resulting in the elimination of his job, which Guz failed to rebut with evidence that this justification was a pretext for age-related animus against him.
*378 We agree with Bechtel that it was entitled to judgment as a matter of law against Guz's age discrimination claim. In support of its motion for summary judgment, Bechtel offered extensive evidence of its reasons, unrelated to age, for eliminating BNI-MI, and for the ensuing individual personnel decisions that led to Guz's final release. In substantial measure, Guz's written response to Bechtel's motion conceded the truth, if not the wisdom, of Bechtel's explanation. To survive summary judgment, Guz was thus obliged to point to evidence raising a triable issue i.e., permitting an inferencethat, notwithstanding Bechtel's showing, its ostensible reasons were a mask for prohibited age bias.
To sustain that burden, Guz first argues there are several triable bases for concluding that Bechtel's stated reasons are false. None of Guz's theories are persuasive. As sole independent support for an inference that Bechtel discriminated, Guz cites comparative-age evidence which suggests, in his view, that Bechtel's decisions favored younger over older workers. But Guz's claim of statistical age bias is weak in numerous respects. In the face of Bechtel's strong and unrebutted showing that it took its actions for nondiscriminatory reasons, the evidence of age favoritism on which Guz relies manifestly lacks sufficient probative force to allow a finding of intentional age discrimination. In the pages that follow, we explain our reasoning in detail.

A. General principles (McDonnell Douglas test).
Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes. (See, e.g., Mixon v. Fair Employment & Housing Com. (1987) 192 Cal.App.3d 1306, 1316, 237 Cal.Rptr. 884 (Mixon).) In particular, California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination, including age discrimination, based on a theory of disparate treatment. (Texas Dept. of Community Affairs v. Burdine (1981) 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (Burdine); McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (McDonnell Douglas); Martin v. Lockheed Missiles & Space Co. (1994) 29 Cal. App.4th 1718, 1730, 35 Cal.Rptr.2d 181 (Martin); Ewing v. Gill Industries, Inc. (1992) 3 Cal.App.4th 601, 610-611, 614, 4 Cal.Rptr.2d 640 (Ewing); County of Alameda v. Fair Employment & Housing Com. (1984) 153 Cal.App.3d 499, 504, 200 Cal.Rptr. 381; see Gonzales v. MetPath, Inc. (1989) 214 Cal.App.3d 422, 426, 262 Cal.Rptr. 654.)[20]
This so-called McDonnell Douglas test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained.
At trial, the McDonnell Douglas test places on the plaintiff the initial burden to establish a prima facie case of discrimination. *379 This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job he sought was withdrawn and never filled. (Burdine, supra, 450 U.S. 248, 253-254, 101 S.Ct. 1089, 67 L.Ed.2d 207; Caldwell v. Paramount Unified School Dist. (1995) 41 Cal.App.4th 189, 202, 48 Cal. Rptr.2d 448 (Caldwell).) While the plaintiffs prima facie burden is "not onerous" (Burdine, supra, at p. 253, 101 S.Ct. 1089), he must at least show "`actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a [prohibited] discriminatory criterion...." [Citation].' [Citation.]" (Ibarbia v. Regents of University of California (1987) 191 Cal.App.3d 1318, 1327-1328, 237 Cal.Rptr. 92, quoting Furnco Construction Corp. v. Waters (1978) 438 U.S. 567, 576, 98 S.Ct. 2943, 57 L.Ed.2d 957.)
The specific elements of a prima facie case may vary depending on the particular facts. (Burdine, supra, 450 U.S. 248, 253, fn. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207; see also Teamsters, supra, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396.) Generally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive. (E.g., Burdine, supra, at p. 253, 101 S.Ct. 1089; Nidds v. Schindler Elevator Corp. (9th Cir. 1996) 113 F.3d 912, 917 (Nidds) [FEHA claim]; Rose v. Wells Fargo & Co. (9th Cir.1990) 902 F.2d 1417, 1421.)[21]
If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises. (St. Mary's Honor Center v. Hicks (1993) 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (Hicks); Burdine, supra, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207.) This presumption, though "rebuttable," is "legally mandatory." (Burdine, supra, at p. 254, fn. 7, 101 S.Ct. 1089; see also Hicks, supra, at p. 506, 113 S.Ct. 2742.) Thus, in a trial, "[i]f the trier of fact believes the plaintiffs evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." (Burdine, supra, at p. 254, 101 S.Ct. 1089, fn. omitted; see also Hicks, supra, at p. 506,113 S.Ct. 2742.)
Accordingly, at this trial stage, the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to "raise[] a genuine issue of fact" and to "justify a judgment for the [employer]," that its action was taken for a legitimate, nondiscriminatory reason. (Burdine, supra, 450 U.S. at pp. 254-255, 101 S.Ct. 1089; Clark v. Claremont University Center (1992) 6 Cal. App.4th 639, 663-664, 8 Cal.Rptr.2d 151 (Clark); see Hicks, supra, 509 U.S. at pp. 506-507, 509, 113 S.Ct. 2742 ["evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason" (italics omitted) ].)
If the employer sustains this burden, the presumption of discrimination disappears. (Hicks, supra, 509 U.S. 502, 510-511, 113 S.Ct. 2742, 125 L.Ed.2d 407; Burdine, supra, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207; Mixon, supra, 192 Cal.App.3d 1306, 1319, 237 Cal.Rptr. 884.) The plaintiff must then have the *380 opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. (Hicks, supra, at pp. 515-518, 113 S.Ct. 2742; Burdine, supra, at p. 256, 101 S.Ct. 1089; Clark, supra, 6 Cal.App.4th 639, 664-665, 8 Cal. Rptr.2d 151.) In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias. (Reeves, supra, 530 U.S. 133, 148-149, 120 S.Ct. 2097, 2109; Hicks, supra, at pp. 511, 518, 113 S.Ct. 2742.) The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff. (Reeves, supra, at pp. 142-143,120 S.Ct. at p. 2106; Hicks, supra, at p. 518, 113 S.Ct. 2742; U.S. Postal Service Bd. of Govs. v. Aikens (1983) 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403; Burdine, supra, at p. 256,101 S.Ct. 1089.)

B. Application.

The Courts of Appeal have pondered how the McDonnell Douglas formula should apply, under California law, to an employer's motion for summary judgment against a claim of prohibited discrimination. Code of Civil Procedure section 437c provides that on summary judgment, the moving party must establish entitlement to "judgment as a matter of law." (Id., subd. (c).) A moving defendant may do so by "show[ing]" that the plaintiffs action "has no merit" (id., subds. (a), (o )(2)), i.e., that "one or more elements ... cannot be established" or "there is a complete defense" (ibid.). Only after the defendant has met that burden must the plaintiff respond with admissible evidence raising a triable issue. (Ibid.)
Several California decisions have suggested that because a plaintiff opposing summary judgment need not demonstrate triable issues until the moving defendant has made an initial no-merit "show[ing]," the McDonnell Douglas burdens are "reversed" on a defense motion for summary judgment against a claim of discrimination in employment. (Sada v. Robert F. Kennedy Medical Center (1997) 56 Cal. App.4th 138, 150-151, 65 Cal.Rptr.2d 112; Addy v. Bliss & Glennon (1996) 44 Cal. App.4th 205, 216, 51 Cal.Rptr.2d 642; Martin, supra, 29 Cal.App.4th 1718, 1730-1731, 35 Cal.Rptr.2d 181; University of Southern California v. Superior Court (1990) 222 Cal.App.3d 1028, 1036, 272 Cal. Rptr. 264 (University of Southern California)). Other California cases, however, have indicated that the plaintiff can survive an employer's motion for summary judgment only by presenting, at the outset, triable evidence satisfying the prima facie elements of McDonnell Douglas. (See, e.g., Horn, supra, 72 Cal.App.4th 798, 805-807, 85 Cal.Rptr.2d 459; Hersant v. Department of Social Services (1997) 57 Cal.App.4th 997, 1002-1006, 67 Cal.Rptr.2d 483 (Hersant); Caldwell, supra, 41 Cal. App.4th 189, 203, 48 Cal.Rptr.2d 448.)
Bechtel urges we adopt the latter view and impose an initial prima facie burden on a plaintiff opposing an employer's motion for summary judgment. Here, Bechtel insists, Guz could not demonstrate a prima facie case, because the transfer of Guz's specific BNI-MI duties to an older worker, Shaeffer, negated an inference of anti-age animus as a matter of law.
In response, Guz argues he should have no prima facie burden to avoid summary judgment. However, Guz asserts, if he did have such a burden, he satisfied it by pointing to evidence that, when implementing its work force reduction, Bechtel treated younger employees more favorably than older.
We need not resolve the "prima facie burden" issue, for an alternative analysis disposes of Guz's cause of action. In its summary judgment motion, Bechtel did not stand mute, relying solely on the premise that Guz failed to demonstrate a prima facie case of age discrimination. As an additional basis for its motion, Bechtel proceeded directly to the second step of the McDonnell Douglas formula. Bechtel set forth competent, admissible evidence *381 (Reeves, supra, 530 U.S. 133, 142-143, 120 S.Ct. 2097, 2106; Hicks, supra, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407; Burdine, supra, 450 U.S. 248, 254-255, 101 S.Ct. 1089, 67 L.Ed.2d 207) of its reasons, unrelated to age bias, why it eliminated Guz's work unit, BNI-MI, and thereafter chose persons other than Guz for vacant positions in the unit to which BNI-MI's functions were transferred.
Bechtel's explanation of nondiscriminatory reasons was creditable on its face. Indeed, as we explain below, Guz has largely conceded the truth, if not the wisdom, of Bechtel's proffered reasons. Guz thus had the burden to rebut this facially dispositive showing by pointing to evidence which nonetheless raises a rational inference that intentional discrimination occurred. (See discussion, post.) For reasons we hereafter set forth, Guz has failed to do so.
As an initial matter, Bechtel argues that the exercise of its prerogative to eliminate Guz's work unit and position constitutes, as a matter of law, a legitimate, nondiscriminatory reason for his termination. However, downsizing alone is not necessarily a sufficient explanation, under the FEHA, for the consequent dismissal of an age-protected worker. An employer's freedom to consolidate or reduce its work force, and to eliminate positions in the process, does not mean it may "use the occasion as a convenient opportunity to get rid of its [older] workers." (Matthews v. Commonwealth Edison Co. (7th Cir.1997) 128 F.3d 1194, 1195; see also, e.g., Cronin v. Aetna Life Ins. Co. (2d Cir.1995) 46 F.3d 196, 204 (Cronin ); Uffelman v. Lone Star Steel Co. (5th Cir.1989) 863 F.2d 404, 407-408.) Invocation of a right to down-size does not resolve whether the employer had a discriminatory motive for cutting back its work force, or engaged in intentional discrimination when deciding which individual workers to retain and release. Where these are issues, the employer's explanation must address them. (See, e.g., Throgmorton v. U.S. Forgecraft Corp. (8th Cir.1992) 965 F.2d 643, 646-647.)
On the other hand, if nondiscriminatory, Bechtel's true reasons need not necessarily have been wise or correct. (See, e.g., Horn, supra, 72 Cal.App.4th 798, 807, 85 Cal.Rptr.2d 459; Hersant, supra, 57 Cal.App.4th 997, 1009, 67 Cal. Rptr.2d 483.) While the objective soundness of an employer's proffered reasons supports their credibility (see discussion, post), the ultimate issue is simply whether the employer acted with a motive to discriminate illegally. Thus, "legitimate" reasons (Burdine, supra, 450 U.S. at p. 254, 101 S.Ct. 1089) in this context are reasons that are facially unrelated to prohibited bias, and which, if true, would thus preclude a finding of discrimination. (See, e.g., Kariotis v. Navistar Intern. Transp. Corp. (7th Cir.1997) 131 F.3d 672, 676 [suggesting that proffered reasons, if "nondiscriminatory on their face" and "honestly believed" by employer, will suffice even if "foolish or trivial or baseless"]; McCoy v. WGN Continental Broadcasting Co. (7th Cir.1992) 957 F.2d 368, 373 [ultimate issue is whether employer "honestly believed in the reasons it offers"]; see also Fuentes v. Perskie (3d Cir.1994) 32 F.3d 759, 765 [issue is discriminatory animus, not whether employer's decision was "wrong or mistaken," or whether employer is "wise, shrewd, prudent, or competent"].)[22]
*382 With these principles in mind, we examine Bechtel's showing of its reasons for the decisions leading to Guz's dismissal. A substantial portion of this evidence was the deposition testimony of Bechtel officials, given under questioning by Guz's counsel.
As noted above, BNI president Johnstone explained at length why he decided to eliminate BNI-MI. Johnstone testified as follows: After assuming BNI's presidency, he grew frustrated with BNI-MI's size, work product, and budget overruns. On the other hand, he had high regard for a similar Bechtel entity, SFRO-MI, with which he had worked in the past. Because SFRO-MI, unlike BNI-MI, provided management information services to many different Bechtel entities, he believed BNI could achieve economies of scale by relying on SFRO-MI, rather than BNI's own in-house unit, for such services. After receiving a budget proposal from SFRO-MI that fell well below BNI-MI's current budget, he decided SFRO-MI could perform BNI-MI's work better and more cheaply.
James Tevis, SFRO-MI's manager, testified at length why, when reorganizing SFRO-MI to assume BNI-MI's work, he gave most of the duties Guz had performed to a current SFRO-MI staff member, John Shaeffer. Tevis also explained why he hired Robert Wraith and Christine Siu to perform work they had been doing at BNI-MI, why he promoted SFRO-MI members John Wallace and Jan Vreim to vacant positions within that unit, and why Barbara Stenho was chosen for another vacant SFRO-MI position.
Thus, Tevis recounted that during the transition, he consulted with his BNI-MI counterpart, Goldstein, about which, if any, BNI-MI employees might assist SFRMI in assuming BNI-MI's functions. Guz was discussed in this context. However, Tevis, who was keenly aware of the need for cost savings, felt that his own current employees, Shaeffer and Chris Gee, could assume Guz's overhead duties, and Goldstein agreed. Tevis did contemplate two new positions at SFRO-MI (in place of the six eliminated at BNI-MI). One of these positions would involve "knowledge of the project side" of Bechtel's business. The other, which Tevis wished to fill at a relatively junior salary grade, would be computer-intensive, and would require facility in Bechtel's new ORS computer operating system. On these bases, the 50-year-old Goldstein, Guz's longtime supervisor and close friend, recommended Wraith and Siu, and not Guz, as the best choices for reassignment to SFRO-MI.
Tevis further indicated why Wallace, Vreim, and Stenho were chosen for positions that later became open at SFRO-MI while Guz was on holding status. First, it became clear, Wallace and Vreim were SFRO-MI veterans, so Tevis had direct experience with their backgrounds, skills, performance levels, and work habits. Moreover, as Tevis explained, the job to which Wallace was promoted required substantial supervisory and computer skills and a project background that would allow effective communication with BNI president Johnstone. Vreim, Wallace's former subordinate, was promoted to Wallace's old position. She was selected for her ORS computer skills, project experience, and supervisory background.
Stenho had not previously worked for SFRO-MI, but, according to Tevis, hers was a special case in another way. Her principal SFRO-MI duty would be to provide management information services to a particular Bechtel entity, Bechtel Civil. Stenho was selected because she had previously worked for Bechtel Civil. That department, unhappy with the services it had been receiving from SFRO-MI, specifically requested that the incumbent SFRO-MI employee, Robert Luchini, be transferred, and that Stenho be assigned to replace him.
*383 Finally, Tevis explained why he had not considered Guz for these positions. Tevis thought Guz "only did overhead," did not realize Guz had supervisory experience, and, in one case "did not even know ... Guz was available." In particular, Tevis mentioned Guz's poor computer skills, as reported to him by Goldstein.[23]
Bechtel's showing of reasons was made by competent and admissible evidence (Code Civ. Proc., § 437c, subd. (d)). Moreover, the reasons advanced were legally sufficient to establish that Guz's FEHA cause of action had no merit (Code Civ. Proc., § 437c, subd (o )(2)), because they were manifestly unrelated to intentional age bias against Guz. If Bechtel's showing of proffered reasons is true, Guz's allegations of intentional age discrimination thus fail, and Bechtel is entitled to judgment as a matter of law. (Id., subd. (c); Martin, supra, 29 Cal.App.4th 1718, 1732, 35 Cal.Rptr.2d 181.) Thus, even if Guz had no initial burden to demonstrate a prima facie case of discriminationa question we do not decideGuz did have a burden, in the face of Bechtel's showing of nondiscriminatory reasons, to show there was nonetheless a triable issue that decisions leading to Guz's termination were actually made on the prohibited basis of his age. (Code Civ. Proc., § 437c, subd. (o)(2); cf. Calvillo-Silva, supra, 19 Cal.4th 714, 735, 80 Cal.Rptr.2d 506, 968 P.2d 65.)
Moreover, an inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons. The pertinent statutes do not prohibit lying, they prohibit discrimination. (Hicks, supra, 509 U.S. 502, 521, 113 S.Ct. 2742, 125 L.Ed.2d 407.) Proof that the employer's proffered reasons are unworthy of credence may "considerably assist" a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons. (Id, at p. 517, 113 S.Ct. 2742.) Still, there must be evidence supporting a rational inference that intentional discrimination, on grounds prohibited by the statute, was the true cause of the employer's actions. (Id., at pp. 510-520, 113 S.Ct. 2742.) Accordingly, the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory.[24]
The United States Supreme Court's recent decision in Reeves, supra, 530 U.S. 133, 120 S.Ct. 2097 confirms this principle. Reeves rejected several federal court of appeals decisions holding that even after the plaintiff has presented prima facie evidence sufficient to establish an inference of prohibited discrimination in the absence of explanation, and has also presented evidence *384 that the employer's innocent explanation is false, the employer is nonetheless necessarily entitled to judgment as a matter of law unless the plaintiff thereafter presents further evidence that the true reason was discriminatory. (Id., at pp. 146-149, 120 S.Ct. at pp. 2108-2109.) Contrary to these decisions, Reeves confirmed that, in a particular case, a plaintiffs showing of pretext, combined with sufficient prima facie evidence of an act motivated by discrimination, may permit a finding of discriminatory intent, and may thus preclude judgment as a matter of law for the employer. (Id., at pp. 148-149, 120 S.Ct. at p. 2109.)
But Reeves made clear that even where the plaintiff has presented a legally sufficient prima facie case of discrimination, and has also adduced some evidence that the employer's proffered innocent reasons are false, the fact finder is not necessarily entitled to find in the plaintiffs favor. Thus, the court admonished, its holding should not be interpreted to mean "that such a showing will always be adequate to sustain a ... finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. [Citations.].... [¶] Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. These include the strength of the plaintiffs prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case...." (Reeves, supra, 530 U.S. 133, 148-149, 120 S.Ct. 2097, 2109, second italics added.)[25]
Though Reeves discusses the federal age discrimination scheme, we find its reasoning sound for purposes of our similar law. We therefore conclude that Guz's age discrimination claim under the FEHA cannot survive Bechtel's motion for summary judgment unless the evidence in the summary judgment record places Bechtel's creditable and sufficient showing of innocent motive in material dispute by raising a triable issue, i.e., a permissible inference, that, in fact, Bechtel acted for discriminatory purposes. (See, e.g., Martin, supra, 29 Cal.App.4th 1718, 1735, 35 Cal.Rptr.2d 181.) As Reeves indicated, summary judgment for the employer may thus be appropriate where, given the strength of the employer's showing of innocent reasons, any countervailing circumstantial evidence of discriminatory motive, even if it may *385 technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred. Such is the case here.
Guz argues at length that the evidence raises a triable issue of the falsity of Bechtel's proffered reasons. The authorities suggest that, in an appropriate case, an inference of dissembling may arise where the employer has given shifting, contradictory, implausible, uninformed, or factually baseless justifications for its actions. (See, e.g., Ewing, supra, 3 Cal. App.4th 601, 615, 4 Cal.Rptr.2d 640; Tinker v. Sears, Roebuck & Co. (6th Cir.1997) 127 F.3d 519, 523; Testerman v. EDS Technical Products Corp. (7th Cir. 1996) 98 F.3d 297, 303; Bechtel Construction Co. v. Secretary of Labor (11th Cir.1995) 50 F.3d 926, 935; but see, e.g., Horn, supra, 72 Cal.App.4th 798, 807, 85 Cal.Rptr.2d 459 [plaintiff cannot simply show employer's decision was mistaken or unwise]; Hersant, supra, 57 Cal.App.4th 997, 1005, 67 Cal.Rptr.2d 483 [same].)
Here, however, the record contains no direct evidence, and little if any circumstantial support, for such a finding. Indeed, Guz has made substantial concessions to the truth of Bechtel's proffered nondiscriminatory reasons for its decision to eliminate BNI-MI and for choosing others to fill positions at SFRO-MI. In its separate statement of undisputed facts (Undisputed Fact Statement) accompanying the motion for summary judgment (see Code Civ. Proc., § 437c, subd. (b)), Bechtel asserted, on the basis of BNI president Johnstone's deposition testimony, that BNI-MI was eliminated because Johnstone was concerned about BNI-MI's performance, had prior satisfactory experience with SFRO-MI, and believed BNI would save money by eliminating its own management information unit and obtaining such services from SFRO-MI, which already served many Bechtel entities. In his required written response to the Undisputed Fact Statement, Guz admitted Johnstone considered BNI-MI's group performance. Guz otherwise "[disputed" Bechtel's explanation only to stress that Johnstone considered such specific cost issues as BNI-MI's overhead budget and the salaries of its employees.[26]
Similarly, the Undisputed Fact Statement, relying on Tevis's deposition testimony, explained Bechtel's decisions to fill SFRO-MI positions with Wraith, Siu, Wallace, Vreim, and Stenho. The Undisputed Fact Statement asserted that Wraith was selected to do "project and proposals work based on his familiarity with project work and PFSR experience." Guz's response claimed this was "[disputed," but his required citation of supporting evidence (Code Civ. Proc., § 437c, subd. (b))a passage from Tevis's depositiondid not materially contradict Bechtel's claim. The Undisputed Fact Statement said Siu was selected "to perform [ORS] input based on her familiarity with the ORS and her grade level." Guz responded that this was "[u]ndisputed," except that by considering Siu's grade level, Tevis also necessarily considered her salary. Finally, the Undisputed Fact Statement set forth the particular qualifications that led Tevis to choose Wallace, Vreim, and Stenho for the positions they filled. Again, in his response, Guz raised no material dispute to the reasons given by Bechtel. Guz also admitted he had recommended SFRO-MI member Shaeffer as the logical choice to assume Guz's duties if Guz were laid off. Thus, much of Bechtel's explanation for the reasons, unrelated to Guz's age, that *386 led to Guz's termination stands uncontradicted.
Guz nonetheless stresses several bases for finding that Bechtel's reasons were pretextual. With respect to the decision to eliminate BNI-MI, Guz emphasizes that over time Bechtel has phrased in different ways its reasons for taking this action. Thus, Guz notes, Goldstein told him the decision to transfer BNI-MI's functions to SFRO-MI was to reduce costs, but in Guz's official layoff notice, Goldstein's superior, Dewey, blamed BNI-MI's demise on a "downturn in our workload." Such "shifting," and "inconsistent" statements, Guz urges, are evidence of dissembling. Guz further points to evidence that Bechtel's purported reasons for eliminating BNI-MI were unsound, and therefore likely untrue, in that Bechtel's business was strong, and that the elimination of BNMI would not save costs.
However, as noted above, Guz has essentially conceded that the reasons cited by Bechtel in support of its motion for summary judgmentcost efficiency and concerns about BNI-MI's performance as a unitwere the true reasons why Bechtel decided to eliminate BNI-MI. Hence, even if a Bechtel official once used the phrase "downturn in ... workload," and even if the cost efficiencies of eliminating BNI-MI are debatable on their merits, such facts are of little or no relevance in determining that Bechtel's cited reasons were a mask for prohibited age discrimination.[27]
Guz also suggests a triable issue that Bechtel has given pretextual reasons why he was selected for layoff. Here Guz cites Bechtel's "unexplained" failure to follow its RIF Guidelines, in that Bechtel laid him off without conducting a formal force ranking, did not help him find a new Bechtel job while he was on holding status, and did not fairly consider him for the vacant SFRO-MI positions. On the latter points, Guz stresses evidence from Tevis's deposition that Tevis never saw Guz's resume and was unaware of Guz's full qualifications and availability. (See ante, 100 Cal. Rptr.2d at p. 361, 8 P.3d at p. 1097.) Moreover, Guz points out, Tevis admitted, after seeing Guz's resume for the first time, that he might have considered Guz qualified for certain of the SFRO-MI jobs. (Ibid.) Guz suggests that in any event, Tevis's excuses for failing to consider him are inherently implausible.
However, neither any failure by Bechtel to conduct the reorganization with full formality, nor Tevis's lack of complete information about Guz's background and availability, strongly suggests that the reasons Bechtel gave for releasing Guz are false. As we have already seen, in his response to Bechtel's summary judgment motion, Guz made major concessions to both the plausibility and the truthfulness of Bechtel's proffered reasons. Essentially uncontradicted are Bechtel's showings (1) that Guz himself proposed Shaeffer as the logical choice to assume Guz's overhead duties, (2) that Tevis had non-age-related business reasons for hiring Wraith, Siu, Wallace, Vreim, and Stenho, and (3) that those persons were well qualified for their positions.
Moreover, Guz has raised no serious dispute to Tevis's testimony that Goldstein recommended Wraith and Siu over Guz and advised Tevis that in the area of computer skills, an important qualification for *387 most of the SFRO-MI jobs, Guz was relatively deficient. Guz has submitted a declaration by Goldstein, who states therein that Guz was qualified for the vacant SFRO-MI positions. However, Goldstein does not contradict Tevis's claims about their discussions concerning Guz. Indeed, in his most recent written evaluation of Guz, issued in March 1992, Goldstein had stated that for long-term success in the company, Guz needed to become more "computer literate."
Nor is there any evidence or inference of Bechtel's bad faith effort to prevent or impede Guz's fair consideration for suitable Bechtel positions. For all that appears, any such lapse arose, as much as anything, from Guz's own inaction. As noted above (ante, at p. 361, 8 P.3d at p. 1097), Guz asserts no personal efforts to find a Bechtel reassignment. In particular, it appears Guz did not proffer his resume to Tevis, though he knew Tevis's unit was assuming BNI-MI's functions, and he could easily have taken that step.
Thus, despite Bechtel's policy to provide placement assistance to laid-off employees, Tevis's testimony that he lacked full information about Guz's skills or availability and did not fully consider Guz is neither implausible nor ominous, but understandable. For Bechtel's part, it is undisputed that the company renewed Guz's initial three-month holding status for a second three months, in order to afford Guz additional time, while receiving company benefits, to find a suitable reassignment.
In sum, we see no grounds in this record for an inference that Bechtel has materially dissembled in explaining the reasons, unrelated to chronological age, for the personnel decisions leading to Guz's dismissal. Under such circumstances, any independent circumstantial evidence of discrimination is insufficient to raise a rational inference that Bechtel acted on grounds of prohibited bias.
At the outset, Bechtel insists that an inference of intentional age discrimination is negated solely by the fact that Shaeffer, an older employee, assumed most of the duties Guz was performing before he was laid off. Guz responds by citing facts he claims amount to a prima facie showing that age bias infected the various personnel decisions leading to his release. Stripped to its essentials, Guz's case relies on the facts that despite his own qualifications and satisfactory performance, (1) he, then age 49, and three of the other five BNI-MI employees (respectively ages 50, 45, and 44) were terminated by Bechtel after that unit's elimination, while the only two persons retained, Wraith, age 41, and Siu, age 34, were the youngest of the group, and (2) two of the three persons later hired by SFRO-MI while Guz was on holding statusWallace, age 43, and Stenho, age 38were significantly younger than he.
Where an age-protected worker is directly replaced by a person not significantly younger, there may be no basis to suspect a motive of prohibited bias. (E.g., Maxfield v. Sinclair Intern.. (3d Cir.1985) 766 F.2d 788, 793; cf. O'Connor v. Consolidated Coin Caterers Corp. (1996) 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (O'Connor) [logical inference of age discrimination may arise where replacement is significantly younger, even if not below statutorily protected age].) But where jobs are eliminated and duties reallocated during a general work force reduction, the issue of discriminatory motive becomes more complicated. In the context of a work force reduction, it has been said that the plaintiffs failure to prove his direct "`replacement by a younger employee is "not necessarily fatal"'" to a claim of discrimination; instead, he need only show, prima facie, that persons significantly younger, but otherwise similarly situated, were "`treated more favorably.'" (Nidds. supra, 113 F.3d 912, 917, quoting Washington v. Garrett (9th Cir.1993) 10 F.3d 1421, 1434; but see, e.g., Barnes v. Gen-Corp Inc. (6th Cir.1990) 896 F.2d 1457, 1465; Simpson v. Midland-Ross Corp. *388 (6th Cir.1987) 823 F.2d 937, 942-944 (Simpson).)
A number of federal decisions have applied the more-favorable-treatment principle to conclude, on facts somewhat analogous to those before us, that a prima facie inference of discrimination can arise from evidence that during a work force reduction, a satisfactory age-protected worker was laid off, while younger employees were retained in similar jobs, or were reassigned to positions for which the plaintiff also qualified. (E.g., Jameson v. Arrow Co. (11th Cir.1996) 75 F.3d 1528, 1533 [older layoff candidate applied for new assignment fitting his qualifications, but was rejected for younger person]; Cronin, supra, 46 F.3d 196, 204 [during work force reduction, employer located positions for younger, but not older, employees]; Branson v. Price River Coal Co. (10th Cir.1988) 853 F.2d 768, 771 [employer fired older employees but retained younger employees in similar positions]; Coburn v. Pan American World Airways, Inc. (D.C.Cir. 1983) 229 App.D.C. 61, 711 F.2d 339, 342 [evidence that during work force reduction, plaintiff was "disadvantaged" in favor of younger person]; see also Hebert v. Mohawk Rubber Co. (1st Cir.1989) 872 F.2d 1104, 1111 [evidence that while age-protected worker was laid off, younger workers were retained in the same position].)
However, in other cases where alleged numerical favoritism of younger workers arose within an extremely small employee pool, courts have rejected any consequent inference of intentional bias on grounds, among others, that the sample was too minuscule to demonstrate a statistically reliable discriminatory pattern. (See, e.g., Fallis v. Kerr-McGee Corp. (10th Cir.1991) 944 F.2d 743, 745-746 [showing that a greater percentage of over-40 than under-40 workers were laid off is nonprobative because the relevant sample, 51 employees, was too small for statistical reliability]; Sengupta v. Morrison-Knudsen Co., Inc. (9th Cir.1986) 804 F.2d 1072, 1076 [showing that, among 28 employees, four of five laid off were Black did not establish prima facie case; statistical sample too small]; see also Simpson, supra, 823 F.2d 937, 943 [even if "age-weighted departure" evidence, based on statistics, established prima facie case, it was insufficient to withstand employer's strong showing of performance-based reasons, where sample was based on only 17 persons]; cf. Mayor v. Educational Equality League (1974) 415 U.S. 605, 611, 94 S.Ct. 1323, 39 L.Ed.2d 630 [where citizen committee appointed by mayor had only 13 positions, statistical showing of race discrimination in appointments was not reliable where a change of only one person "meant an 8% change in racial composition"].)
Here, for several reasons, we conclude the comparative-age evidence cited by Guz, even if barely adequate to demonstrate a prima facie case, is insufficient for trial in the face of Bechtel's strong contrary showing that its reasons were unrelated to agerelated bias. In the first place, the statistical inferences to be drawn from Guz's raw age comparisons are not nearly as strong as he implies. As suggested above, the premise that Bechtel purposely favored two workers on the basis of youth when deciding which BNI-MI employees to retain is weakened, for statistical purposes, by the small size of that unit, which included only six persons. A similar analysis applies to the three other positions for which Guz claims, or implies, he should have been considered at SFRO-MI.[28]
*389 Any arguable discriminatory inference is further diluted by other age-based evidence from which a contrary conclusion might be drawn. Thus, while it is not dispositive that, consistent with Guz's earlier recommendation, his own duties went to an older worker, Shaeffer, that fact significantly undermines any suspicion that chronological age influenced Guz's dismissal. Similar doubt arises from the fact that at age 52, Vreim, one of the three workers later selected for an open position in SFRO-MI, was also older than Guz.
Moreover, an issue arises whether the younger persons with whom Guz seeks comparison were younger enough to raise a logical suspicion of intentional age bias. Courts have differed about the exact gap in age that is significant for purposes of a discriminatory inference. (See, e.g., Roster v. Trans World Airlines, Inc. (1st Cir. 1999) 181 F.3d 24, 31 (applying Mass. law) [prima facie case is established where duties of 49- and 48-year-olds were partially assumed by 25-year-old]; Schlitz v. Burlington Northern R.R. (8th Cir.1997) 115 F.3d 1407, 1413 [five-year age gap between plaintiff applicant and persons selected is not significant]; Barber v. CSX Distribution Services (3d Cir.1995) 68 F.3d 694, 699 [eight-year difference between plaintiff and successful applicant is significant]; Healy v. Neiv York Life Ins. Co. (3d Cir.1988) 860 F.2d 1209, 1214 [replacement of 56-year-old senior manager by person nine years younger is significant]; Douglas v. Anderson (9th Cir.1981) 656 F.2d 528, 533 [replacement of 54-year-old bookstore manager by person five years younger is significant].) One federal circuit follows the rule that any gap less than 10 years is presumptively insignificant, but the plaintiff can overcome the presumption with other evidence that the employer considered his age significant. (Hartley v. Wisconsin Bell, Inc. (7th Cir.1997) 124 F.3d 887, 892-893; see also Richter, supra, 142 F.3d 1024, 1029.)
Here, Wraith, one of the two reassigned BNI-MI employees, and Wallace, who took one of the later open positions at SFRO-MI, were, like Guz, in their midcareer 40's. Wraith, at 41, was eight years younger than the 49-year-old Guz, and Wallace, at 43, was only six years younger. There is no independent indication whatever that Bechtel considered the age differences among these three workers significant. Of the four younger persons Guz alleges were treated more favorably than he, only two were over 10 years younger. Guz does not dispute that one of these two, the 38-year-old Stenho, was uniquely qualified for her SFRO-MI job; she was hired, at the specific request of Bechtel Civil, to provide service to that office, where she had previously worked. (See discussion, ante.) Under these circumstances, Guz's arithmetic does not, in our view, strongly support a logical inference "`that [Bechtel's] employment decision[s] [were] based on a[n] [illegal] discriminatory criterion.'" (O'Connor, supra, 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433, quoting Teamsters, supra, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396, first three brackets added, italics omitted.)
Any inference that Guz's raw age comparisons indicate age-based discrimination is further blurred by the weak evidence that the workers retained or hired over him were similar or comparable except for their dates of birth. Guz does not appear to dispute that the six individual members of the eliminated unit, BNI-MI, performed distinct duties at disparate ranks and levels of responsibility. The available SFRMI positions were also distinct, and it appears essentially undisputed that those jobs were filled by persons who fit their individual requirements as well as, or better than, Guz. As previously noted, most of these positions required considerable computer facility, while Guz's skills in this area were mediocre at best. The qualifications for Stenho's position essentially excluded any other candidate for that job. These *390 variances undermine any rational conclusion from the raw age data that age was a significant factor in Bechtel's decisions to choose others instead of Guz.[29]
In sum, even without considering Bechtel's explanation, Guz's evidence raised, at best, only a weak suspicion that discrimination was a likely basis for his release. Against that evidence, Bechtel has presented a plausible, and largely uncontradicted, explanation that it eliminated BNMI, and chose others over Guz, for reasons unrelated to age. Indeed, Guz has raised little argument against Bechtel's further claim that, even if he was minimally qualified for the positions he lost, those persons who were actually chosen better fit Bechtel's needs.
Under these circumstances we conclude, as a matter of law, that Guz has failed to point to evidence raising a triable issue that Bechtel's proffered reasons for its actions were a pretext for prohibited age discrimination. Bechtel is therefore entitled to summary judgment on this claim.

CONCLUSION
For the reasons set forth herein, the judgment of the Court of Appeal is reversed. The cause is remanded to the Court of Appeal for further proceedings consistent with this opinion.
GEORGE, C.J., MOSK, J., WERDEGAR, J., CHIN, J., and BROWN, J., concur.
Concurring Opinion By MOSK, J.
I concur in the majority opinion. I write separately to clarify what may appear to be an inconsistency between parts II and IV of that opinion.
In part II, the majority hold that there was insufficient evidence from which a reasonable jury could conclude that Bechtel National, Inc's (BNI) business reorganization was merely a pretext to terminate John Guz. There is therefore no triable issue that BNI breached its implied contractual obligation by failing to follow the "progressive discipline" policy promised in its policy manual to its employees before they are discharged for poor performance. The majority do not decide, however, whether there is a triable issue regarding BNI's breach of its own layoff policies, and leave this question to the Court of Appeal on remand. If the Court of Appeal concludes *391 there is such a triable issue, and if Guz is able to prove at trial that these policies were breached, and that if he had been fairly considered for a position as dictated in the policies, he would more likely than not have retained his job, then Guz will have proved a contractual wrongful termination and be eligible for the usual damages associated with such a termination.
In part IV, the majority conclude that there is insufficient evidence from which a reasonable jury could conclude that BNI's termination of Guz was based on age discrimination. In so doing, the majority view this case as fitting into the class of cases discussed in Reeves v. Sanderson Plumbing Products, Inc. (2000) 530 U.S. 133, 148-149, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 in which "although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." The Reeves court elaborated, by way of example, that "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, non-discriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." (530 U.S. at p. 148, 120 S.Ct. at p. 2109.) Although the question is close, I agree with the majority that, in light of Guz's concessions as to the nondiscriminatory nature of many of BNI's actions, and in light of the weakness of Guz's prima facie case, this case fits into the relatively narrow class of cases referred to in Reeves.
Nonetheless, although BNI apparently had a nondiscriminatory reason for terminating Guz, that is not to conclude that it necessarily complied with its own contractual layoff policies. Nor does it negate the possibility that had it so complied, Guz would have retained his employment. These possibilities remain to be determined on remand and, if appropriate, at trial.
Concurring Opinion By CHIN, J.
I agree with the majority. I write separately to state another reason the trial court correctly granted summary judgment against plaintiff John Guz on the age discrimination claim: Even after "extensive discovery" (maj. opn, ante, 100 Cal. Rptr.2d at p. 359, 8 P.3d at p. 1095), Guz has produced no credible evidence that defendants Bechtel National, Inc., and Bechtel Corporation (collectively Bechtel) discharged him because of his age. Bechtel, the moving party on summary judgment, has met its burden of showing that Guz cannot state a prima facie age discrimination case. Accordingly, Bechtel had no duty even to rebut Guz's age discrimination claim, although I agree that it also did so.

I. The Legal Standard for Summary Judgment
To prevail at trial, indeed, to avoid a nonsuit, the plaintiff bears the burden of establishing a prima facie case of discrimination. (See generally McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; maj. opn, ante, 100 Cal.Rptr.2d at pp. 378-379, 8 P.3d at p. 1113; Caldwell v. Paramount Unified School Dist. (1995) 41 Cal.App.4th 189, 203-204, 48 Cal.Rptr.2d 448.) I agree with the majority regarding what this prima facie burden is. It is not onerous, but the plaintiff must show that the employer's actions, if unexplained, support an inference that they were more likely than not based on a prohibited discriminatory criterion. (Maj. opn, ante, at p. 379, 8 P.3d at p. 1114.) Specifically, the plaintiff must show some "circumstance [that] suggests discriminatory motive." (Ibid.; see also O'Connor v. Consolidated Coin Caterers *392 Corp. (1996) 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433.)[1]
Some uncertainty currently exists regarding the way this rule applies to an employer's motion for summary judgment in a discrimination action. (Maj. opn., ante, at pp. 380-381, 8 P.3d at pp. 1114-1115.) California's traditional rule was that to prevail on summary judgment, a "defendant must conclusively negate a necessary element of the plaintiffs case, and demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial." (Molko v. Holy Spirit Assn. (1988) 46 Cal.3d 1092, 1107, 252 Cal.Rptr. 122, 762 P.2d 46.) In 1992 and 1993, however, the Legislature amended Code of Civil Procedure section 437c, the statute concerning summary judgment. (See generally Union Bank v. Superior Court (1995) 31 Cal.App.4th 573, 581-584, 37 Cal.Rptr.2d 653.) Today, as relevant, Code of Civil Procedure section 437c, subdivision (o)(2), provides that a defendant has met its burden on summary judgment "of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action ... cannot be established, or that there is a complete defense to that cause of action. Once the defendant ... has met that burden, the burden shifts to the plaintiff ... to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff ... may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto."
This court has not yet considered the effect of these amendments in a discrimination case. The Courts of Appeal have, however, considered this question in detail, and not always consistently. (See, e.g., the exhaustive discussion in Scheiding v. Dinwiddie Construction Co. (1999) 69 Cal. App.4th 64, 69-83, 81 Cal.Rptr.2d 360 (Scheiding).) Some courts have held that to prevail on summary judgment, the defendant need merely point to the plaintiffs lack of evidence establishing a prima facie case. (Hersant v. Department of Social Services (1997) 57 Cal.App.4th 997, 1002, 67 Cal.Rptr.2d 483 ["The burden-shifting system requires the employee first establish a prima facie case of age discrimination"]; Horn v. Cushman & Wakefield Western, Inc. (1999) 72 Cal.App.4th 798, 806, 85 Cal.Rptr.2d 459; Caldwell v. Paramount Unified School Dist, supra, 41 Cal. App.4th at p. 203, 48 Cal.Rptr.2d 448 ["Thus, the burdens of proof for purposes of a defendant's motion for summary judgment are precisely the same as those mandated by McDonnell Douglas"].) Others have required the defendant to prove the "plaintiffs inability to prove its own case...." (Certain Underwriters at Lloyd's of London v. Superior Court (1997) 56 Cal.App.4th 952, 959, 65 Cal. Rptr.2d 821, italics omitted.) Others have suggested that because the moving party must negate the plaintiffs right to prevail on a particular issue, the burden is reversed on summary judgment. (Sada v. Robert F. Kennedy Medical Center (1997) 56 Cal.App.4th 138, 150, 65 Cal.Rptr.2d 112; Addy v. Bliss & Glennon (1996) 44 Cal.App.4th 205, 216, 51 Cal.Rptr.2d 642.)
I believe the Court of Appeal cases can generally be reconciled. The recent decisions recognize that Code of Civil Procedure section 437c, subdivision (o)(2), significantly *393 changed California summary judgment law. To prevail on summary judgment, the defendant no longer must conclusively negate the plaintiffs case. Given the difficulty of proving a negative, such a test is often impossibly high. However, the statute also places an initial burden on the defendant in order to prevail on summary judgment. As explained in Scheiding, the differences in the cases can largely be described as differing degrees of caution rather than outright disagreement. (Scheiding, supra, 69 Cal. App.4th at pp. 82-83, 81 Cal.Rptr.2d 360.) That case quoted with approval (ibid.) most of the following discussion in Hagen v. Hickenbottom (1995) 41 Cal.App.4th 168, 48 Cal.Rptr.2d 197: "We cannot agree with those who may be understood to suggest that a moving defendant may shift the burden simply by suggesting the possibility that the plaintiff cannot prove its case. It is clear to us, from the requirement ... that a defendant have `shown that one or more elements of the cause of action ... cannot be established' (Code Civ. Proc, § 437c, former subd. (n)(2) [now subd. (o)(2)]; ...), that a defendant must make an affirmative showing in support of his or her motion. Such a showing connotes something significantly more than simply `pointing out to the ... court' that `there is an absence of evidence': before the burden of producing even a prima facie case should be shifted to the plaintiff in advance of trial, a defendant who cannot negate an element of the plaintiffs case should be required to produce direct or circumstantial evidence that the plaintiff not only does not have but cannot reasonably expect to obtain a prima facie case. But where such a showing can be made we consider it both fair to the defendant and consistent with efficient administration of justice that the plaintiff be called upon, on risk of summary judgment, to make a prima facie case." (Id. at p. 186, 48 Cal.Rptr.2d 197.)
I think this discussion aptly summarizes the law. To prevail on summary judgment in a discrimination case, the defendant must show that the plaintiff both has not established and cannot reasonably expect to establish a prima facie case. A defendant can meet the former burden merely by showing the absence of evidence of discrimination. But that is not enough. The defendant must also show, by direct or circumstantial evidence, that the plaintiff cannot reasonably expect to obtain a prima facie case. This latter showing, however, is not impossibly difficult. If a plaintiff has had the full opportunity to obtain discovery and to present all available evidence in support of a discrimination claim, and still has failed to establish a prima facie case, the trial court may reasonably infer that the plaintiff cannot do so. If the plaintiff cannot present a prima facie case, a nonsuit at trial would be inevitable. (Code Civ. Proc., § 581c; Caldwell v. Paramount Unified School Dist, supra, 41 Cal.App.4th at pp. 203-204, 48 Cal.Rptr.2d 448.) In that case, the trial court should grant summary judgment and avoid a useless trial.

II. The Legal Standard Applied to This Case
Bechtel has shown that Guz had a full opportunity to discover and present all available evidence, and that he nonetheless has not stated a prima facie case of age discrimination. This showing meets Bechtel's burden of establishing that Guz cannot state a prima facie case, thus entitling it to summary judgment on this cause of action. Despite extensive discovery, Guz can point to no comments by anyone during his entire lengthy history with Bechtel suggesting age played a role in employment decisions in general, or in his case in particular, no meaningful statistical evidence, no evidence even of a possible financial or other motive for Bechtel to get rid of its older workers. He cites no evidence suggesting that age was a significant factor in Bechtel's layoff decision.[2]
*394 It is true that Guz was a member of the protected class, but that fact alone proves nothing. In a reduction in force, many qualified, productive workers, both within and outside a protected class, lose their positions. Older workers may be laid off just like younger ones. The laws against age discrimination do not "`require[ ] that younger employees be fired so that employees in the protected age group can be hired.'" (Earley v. Champion Intern. Corp. (11th Cir.1990) 907 F.2d 1077, 1083; see also Vaughan v. Metrahealth Companies, Inc. (4th Cir.1998) 145 F.3d 197, 204 [age discrimination laws are not "something akin to a strict seniority protection system"]; Jameson v. Arrow Co. (11th Cir. 1996) 75 F.3d 1528, 1532-1533.) Accordingly, "the decision to discharge a qualified, older employee is not inherently suspicious.... In a [reduction in force], qualified employees are going to be discharged." (Brocklehurst v. PPG Industries, Inc. (6th Cir.1997) 123 F.3d 890, 896.)
Like the concurring and dissenting opinion, Guz relies largely on two circumstances to support the age discrimination claim. The first is that, of three positions that employees other than Guz filled while Guz was on holding status, younger employees filled two, and an older employee filled only one. This fact is meaningless. Even aside from the minuscule size of the sampling (see post), Guz does not tell us the average age of persons eligible or considered for these positions. If a majority of those persons were younger than Guz, a majority of those given the positions would likely also be younger. Guz "did not even attempt to place his figures in a relevant context so as to make them meaningful.... [¶] ... [H]e neglects vital information regarding the pool of applicants and whether, for example, qualified older employees were available or applied for those jobs.... [E]mployee statistics unaccompanied by evidence regarding qualified potential applicants from the relevant labor market ... lack[] probative value." (Simpson v. Midland-Ross Corp. (6th Cir. 1987) 823 F.2d 937, 943.) Guz's related arguments regarding his qualifications relative to those retained does not aid him. "As courts are not free to second-guess an employer's business judgment, this assertion [that plaintiff was equally or more qualified than the people retained] is insufficient to permit a finding of pretext." (Branson v. Price River Coal Co. (10th Cir.1988) 853 F.2d 768, 772.) "Thus, plaintiffs general dispute concerning his job performance, in the absence of any other evidence of age discrimination, does not provide a sufficient basis for a jury to infer that [the employer] terminated plaintiff on the basis of his age." (Fallis v. Kerr-McGee Corp. (10th Cir.1991) 944 F.2d 743, 747.)
The second circumstance Guz cites comes closest to presenting evidence that might suggest age discrimination: Of the six persons in his unit, Bechtel retained the youngest two. This fact also fails to arouse suspicion for several reasons.
First, a group of six is simply too small to be statistically significant. "For [the plaintiff] to show a prima facie case of disparate treatment based solely on statistics he must show a `"stark" pattern' of discrimination unexplainable on grounds other than age." (Palmer v. United States (9th Cir.1986) 794 F.2d 534, 539; Rose v. Wells Fargo & Co. (9th Cir.1990) 902 F.2d 1417, 1423.) In Mayor v. Educational Equality League (1974) 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630, the United States Supreme Court found of "no significance" statistics based on a group of 13, "[i]n large part ... because the number of positions ... was too small to provide a reliable sample." (Id. at p. 611, 94 S.Ct. 1323; see also id. at p. 612, 94 S.Ct. 1323.) *395 A change of only one person "meant an 8% change in racial composition." (Id. at p. 611, 94 S.Ct. 1323.) Here, the numbers are even smaller. A single changeretaining the 50 year old and laying off the 34 year oldwould not have affected Bechtel's actions towards Guz in the slightest but would have made the statistics show action favoring older persons. Many cases have found no statistical significance with groups larger than six. (E.g., Vaughan v. Metrahealth Companies, Inc., supra, 145 F.3d at p. 203 ["a sample of seven employees ... is too small for reliable analysis"]; Brocklehurst v. PPG Industries, Inc., supra, 123 F.3d at p. 897 [group of 14 is too small]; Fallis v. Kerr-McGee Corp., supra, 944 F.2d at p. 746 [group of nine "is too small to provide reliable statistical results"]; Simpson v. Midland-Ross Corp., supra, 823 F.2d at p. 943 & fn. 7, and cases cited [reliance on a sample of 17 is "suspect"]; Sengupta v. Morrison-Knudsen Co., Inc. (9th Cir.1986) 804 F.2d 1072, 1076 [group of 28 is too small].)
Second, Bechtel did not systematically replace older persons with substantially younger ones. Of the six in Guz's group, all but one were in their 40's (or 50); one was 34. The replacement of a worker with another "substantially younger than the plaintiff (O'Connor v. Consolidated Coin Caterers Corp., supra, 517 U.S. at p. 313, 116 S.Ct. 1307) might look suspicious, but not these actions. Hartley v. Wisconsin Bell, Inc. (7th Cir.1997) 124 F.3d 887 considered the "question: how much older than a replacement does a plaintiff have to be in order to pass O'Connor's, test?" (Id at p. 892.) "While we suspect that the answer depends to some extent on the circumstances in a case, we consider a ten-year difference in ages (between the plaintiff and her replacement) to be presumptively 'substantial' under O'Connor. In cases where the disparity is less, the plaintiff may still present a triable claim if she directs the court to evidence that her employer considered her age to be significant. In that instance, the issue of age disparity would be less relevant.... [¶] ... Ten years is a reasonable threshold establishing a `significant' and `substantial' gap, which is what O'Connor demands. Yet the line we draw is not so bright as to exclude cases where the gap is smaller but evidence nevertheless reveals the employer's decision to be motivated by the plaintiffs age." (Id at p. 893.)
This assessment seems reasonable. In a given case, the plaintiff might be able to show that an age difference of less than 10 years was significant to the employer. For example, if some important contractual right vested at the age of 50, then replacing a 49 year old with someone younger, even if less than 10 years younger, might be replacing a person with someone substantially younger. But no such evidence exists here. Absent any evidence that Bechtel considered the age differences of persons in their 40's to be significant, I would find them insignificant. Without more, choosing among various persons in their 40's gives no cause to suspect age discrimination. Specifically, replacing a 49 year old with a 41 year old is not, by itself, replacing a person with someone substantially younger. Only one person in the group in this casethe 34 year old-was substantially younger than Guz.
Third, the members of the group of six had different qualifications and performed different duties. "[A] plaintiffs statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals." (Fallis v. Kerr-McGee Corp., supra, 944 F.2d at p. 746.) "[T]here must be evidence that [those over 40] had positions and performance ratings that were comparable to [those under 40] who were retained." (Id at p. 747.) Here, the group was quite disparate. One, for example, was a secretary, who had duties not remotely similar to Guz's.
*396 Fourth, any slight weight we may give to plaintiffs statistics is negated by the fact that Guz's own duties were largely assumed by someone older than he. (Maj. opn, ante, 100 Cal.Rptr.2d at p. 386, 8 P.3d at p. 1120.) This fact, even if not itself dispositive, eliminates any suspicious inference that may be drawn from Bechtel's retaining the two youngest of Guz's group. "[T]he fact that [the employer] replaced [plaintiff] with [an] even older [employee] contradicts [plaintiffs] claims of discriminatory animus." (Brocklehurst v. PPG Industries, Inc., supra, 123 F.3d at p. 897.)
Guz also argues that Bechtel did not follow its own fair layoff procedures, and that this circumstance supports his discrimination claim. The argument is factually dubious but even if correct would fail to suggest age discrimination. A mere failure to follow formal internal policies does not support a discrimination claim. In Vaughan, the employer had an "elaborate Downsizing Policy ... memorialized in a 144-page Downsizing Manual." (Vaughan v. Metrahealth Companies, Inc., supra, 145 F.3d at p. 200.) "... Cooper, who made the decision to discharge [the plaintiff], admitted he was not familiar with the Downsizing Manual, [and] had never read it...." (Ibid.) Thus, the "district court noted ... various differences between the Downsizing Manual and Cooper's actual decision-making process." (Id. at p. 201.) But this showing was not sufficient to support the discrimination claim. "The plaintiff must have developed some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action." (Id at p. 202.) The employer's failure "to follow its own Manual ... does not even hint that the real motive was age discrimination. `The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent.' Randle v. City of Aurora, 69 F.3d 441, 454 (10th Cir.1995). Federal courts cannot ensure that business decisions are always informed or even methodical." (Id at p. 203; see also Rose v. Wells Fargo & Co., supra, 902 F.2d at p. 1422; Moore v. Eli Lilly & Co. (5th Cir. 1993) 990 F.2d 812, 819.)
Guz's inability to present any credible evidence to establish his age discrimination claim supports the superior court's grant of summary judgment in Bechtel's favor.
BROWN, J, concurs.
Concurring and Dissenting Opinion By KENNARD, J.
California statutory law prohibits employers from discriminating against workers over the age of 40. In this case, an employee sued his employer after it eliminated his job in the wake of a corporate reorganization and then passed him over in favor of younger workers when other positions became available. At the time of his discharge, the employee had worked for his employer 22 years, and he was 49 years old.
The employee's various causes of action included one for age discrimination, on which the trial court granted summary judgment for the employer. The Court of Appeal disagreed. Unlike the majority here, I would affirm the judgment of the Court of Appeal. I agree, however, with the majority's resolution of the employee's other causes of action.

I
This matter comes to us after the trial court granted defendant employer's motion for summary judgment. Under California law, a moving party is entitled to summary judgment only when no "triable issue of material fact" remains for trial. (Code Civ. Proc, § 437c, subd. (o)(1) & (2).) In reviewing an order granting or denying summary judgment, "we examine the facts presented to the trial court and determine their effect as a matter of law." (Parsons v. Crown Disposal Co. (1997) 15 Cal.4th 456, 464, 63 Cal.Rptr.2d 291, 936 P.2d 70.)
*397 In 1993, plaintiff John Guz worked for Bechtel National, Inc. (BNI), a wholly owned subsidiary of Bechtel Corporation (Bechtel). Guz was one of six employees in BNI's management information unit (BNI-MI); he was a financial reports manager, making $71,280 a year. That year, during a phase of corporate reorganization, Bechtel eliminated BNI-MI and transferred its functions to Bechtel's San Francisco Regional Office Management Information Group (SFRO-MI). Reassigned to SFRO-MI as part of this transfer were BNI-MI's two youngest members, both of whom held lower grade positions and earned lower salaries than Guz. Shortly thereafter, SFRO-MI created three new positions, two of which it filled with workers younger than Guz. The younger workers were between seven and 15 years younger than Guz. Even though Guz was willing to take a grade cut and pay cut, Bechtel did not consider him for the new SFRO-MI positions, and it discharged him.
Guz's lawsuit against Bechtel alleged various causes of action, including one for age discrimination in violation of California's Fair Employment and Housing Act (FEHA). (Gov.Code, § 12941, subd. (a).)[1] Bechtel moved for summary judgment, asserting, as relevant here, these reasons for the termination: (1) It eliminated BNMI, where Guz was employed, because of a "downturn in workload" and to consolidate costs; (2) Guz's tasks were then assumed by existing workers at SFRO-MI; and (3) the younger employees chosen to fill the SFRO-MI positions were better qualified for those particular positions than Guz.
Guz disputed these reasons as "pretextual." He presented evidence that (1) he was qualified for each of the positions filled at SFRO-MI; (2) in eliminating BNI-MI and terminating him, Bechtel failed to comply with its internal Reduction-in-Force Guidelines (which required that all affected employees be ranked by job skills and functions), thereby depriving him of a fair, objective, and consistent evaluation in comparison with others; and (3) Bechtel's asserted reasons for eliminating BNI-MIcost savings and a reduction in workloadwere demonstrably false because SFRO-MI had to add a total of five positions to cover the work transferred from the six-member BNI-MI unit.
Ruling that Guz had failed to show that Bechtel's proffered reasons were a pretext for age discrimination, the trial court granted summary judgment. The Court of Appeal reversed, concluding that material issues of fact on Guz's FEHA claim were in dispute and needed to be resolved by a full trial.

II
As relevant here, the FEHA prohibits an employer from discharging "any individual over age W on the ground of age." (§ 12941, subd. (a), italics added.) "[T]he practice of age discrimination, like other forms of invidious discrimination, `foments domestic strife and unrest' in the workplace (Gov.Code, § 12920), making for a more stressful and ultimately less productive work environment." (Stevenson v. Superior Court (1997) 16 Cal.4th 880, 895, 66 Cal.Rptr.2d 888, 941 P.2d 1157.) Thus, the FEHA's express policy condemning discrimination against older workers benefits the public at large. (Ibid.)
Here, plaintiffs case is based on a theory of "disparate treatment," meaning that because of his age (49 years at the time of discharge), Bechtel treated him less favorably than it did younger workers. (See Martin v. Lockheed Missiles & Space Co. (1994) 29 Cal.App.4th 1718, 1730, 35 Cal. Rptr.2d 181; Rose v. Wells Fargo & Co. (9th Cir.1990) 902 F.2d 1417, 1421.) "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." (Reeves v. Sanderson (2000) 530 *398 U.S. 133, 153, 120 S.Ct. 2097, 2111, 147 L.Ed.2d 105 (Reeves).)
In disparate treatment cases, California courts apply the test that the United States Supreme Court articulated in McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792, 802-803, 93 S.Ct. 1817, 36 L.Ed.2d 668 (McDonnell Douglas) to assess such cases when brought under federal law. (Martin v. Lockheed. Missiles & Space Co., supra, 29 Cal.App.4th at p. 1730, 35 Cal.Rptr.2d 181.) This test governs the allocation of the burden of production and the order for the presentation of proof at the trial of a discrimination case. (Reeves, supra, 530 U.S. at pp. 142-143, 120 S.Ct. at p. 2106; St. Mary's Honor Center v. Hicks (1993) 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (Hicks).)
Under the McDonnell Douglas test, a plaintiff employee claiming discrimination has the initial burden to establish "by a preponderance of the evidence, a `prima facie' case of ... discrimination." (Hicks, supra, 509 U.S. at p. 506, 113 S.Ct. 2742; Texas Dept. of Community Affairs v. Burdine (1981) 450 U.S. 248, 252-253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (Burdine ).) When, as here, the alleged age discrimination resulting in the employee's discharge occurs during an employer's restructuring of its work force, the employee can make a prima facie case based on evidence that the employee (1) was age 40 or older; (2) satisfied the employer's legitimate expectations of job performance; and (3) the employer treated younger workers more favorably (for instance, by offering them replacement positions denied to the discharged employee). (See Collier v. Budd Co. (7th Cir. 1995) 66 F.3d 886, 889-890; Greene v. Safeway Stores, Inc. (10th Cir.1996) 98 F.3d 554, 560; see also Jameson v. Arrow Co. (11th Cir.1996) 75 F.3d 1528, 1533.) With respect to the third factor (more favorable treatment of younger workers), a number of federal appellate courts have pointed out that a discharged employee's failure to prove replacement by a younger worker does not necessarily defeat a claim of age discrimination if the termination is the result of a general reduction in work force. (Rose v. Wells Fargo & Co., supra, 902 F.2d at p. 1421; Armbruster v. Unisys Corp. (3d Cir.1994) 32 F.3d 768, 777; Freeman v. Package Machinery Co. (1st Cir.1988) 865 F.2d 1331, 1335, fn. 2. [replacement by a younger person not an element of prima facie age discrimination case].)
Once the discharged employee has established a prima facie case of discrimination, there is a presumption of unlawful discrimination by the employer. (Hicks, supra, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407; Burdine, supra, 450 U.S. at p. 254, 101 S.Ct. 1089.) As the high court has explained: "A prima facie case under McDonnell Douglas raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. [Citation.] And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, whom we generally assume acts with some reason, based his decision on an impermissible consideration such as race [or age]." (Furnco Construction Corp. v. Waters (1978) 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957, italics omitted.)
If the trier of fact finds the discharged employee's prima facie case persuasive, and the employer remains silent in the face of the just-described presumption of unlawful discrimination, the trial court "must enter judgment for the plaintiff because no issue of fact remains in the case." (Burdine, supra, 450 U.S. at p. 254, 101 S.Ct. 1089.) The employer is, of course, free to rebut the presumption by presenting evidence of a legitimate, nondiscriminatory *399 reason for the termination. (Hicks, supra, 509 U.S. at p. 507, 113 S.Ct. 2742.)
An employer's desire to reduce expenses by eliminating some employee positions is not itself a legitimate, nondiscriminatory reason for the discharge of older workers. Chief Judge Richard Posner of the federal Court of Appeals for the Seventh Circuit explained this in a case alleging disability discrimination during corporate downsizing. "Even if the employer has a compelling reason wholly unrelated to the disabilities of any of its employees to reduce the size of its work force, this does not entitle it to use the occasion as a convenient opportunity to get rid of its disabled workers. [Citations.] This point is most easily seen by thinking of a [reduction in work force] as a kind of hiring: the employer has decided to reduce its work force from, say, 100 to 80 employees; this means it has 80 slots to fill and in filling them must choose among 100 `applicants.' The law forbids the employer to disqualify the disabled applicants on the basis of their disability." (Matthews v. Commonwealth Edison Co. (7th Cir.1997) 128 F.3d 1194, 1195.) This reasoning applies with equal force to a case alleging age discrimination.
Nor is it sufficient for the employer to show that the discharged older workers earned higher salaries than the younger workers who were retained. Although a Court of Appeal reached a contrary conclusion in Marks v. Loral Corp. (1997) 57 Cal.App.4th 30, 68 Cal.Rptr.2d 1, and this court denied review (Justice Mosk and I voting to grant), the Legislature has since expressly abrogated that decision by declaring "that the use of salary as the basis for differentiating between employees when terminating employment may be found to constitute age discrimination if use of that criterion adversely impacts older workers as a group, and ... that the disparate impact theory of proof may be used in claims of age discrimination." (§ 12941.1, enacted by Stats.1999, ch. 222, § 2.)[2]
When, under the McDonnell Douglas burden-allocation rules, the employer responding to a discharged employee's prima facie case of age discrimination offers legitimate, nondiscriminatory reasons for the discharge, what countervailing evidence must the employee present to sustain a judgment after trial? This was the question before the United States Supreme Court in Reeves, supra, 530 U.S. 133, 120 S.Ct. 2097. There, the 57-year-old plaintiff had worked for a plumbing manufacturer for 40 years when he was fired. The employees who later filled the plaintiffs former position were all in their 30's. At trial, the employer disputed that age was the motivating factor for the discharge, asserting that it terminated the plaintiff because he had not kept accurate records of employee attendance. The jury awarded damages to the plaintiff, but the federal Court of Appeals reversed for insufficiency of evidence. The United States Supreme Court disagreed. Describing the issue as "the kind and amount of evidence necessary to sustain a jury's *400 verdict that an employer unlawfully discriminated on the basis of age" (Reeves, supra, 530 U.S. at p. 137, 120 S.Ct. at p. 2103), the high court held that the circuit court had "misconceived the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through indirect evidence" (id, at p. 146, 120 S.Ct. at p. 2108). That burden could be satisfied by evidence of the "plaintiffs prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false." (Id. at p. 148, 120 S.Ct. at p. 2109.) From such evidence, a trier of fact could reasonably conclude "that the employer unlawfully discriminated." (Ibid.)

III
Consideration of the evidence here in light of the legal framework discussed, ante, leads to these conclusions:
Guz's evidence presented in opposition to Bechtel's summary judgment motion was sufficient to establish a prima facie case of age discrimination under the McDonnell Douglas test: (1) He was over 40 years of age when terminated; (2) his job performance exceeded Bechtel's legitimate expectations (he was promoted six times, and was given 17 merit raises, and he received a Silver Performance Plus Award for saving the company $1.7 million; his 1991-1992 performance review described him as a "strong performer in his group"; and in his 22 years at Bechtel, he was never told his skills were deficient); and (3) Bechtel treated younger workers more favorably than older workers by transferring, from the disbanded BNI-MI unit (where Guz was employed) to SFRO-MI and selecting for two of the three new SFRO-MI positions, workers between seven and 15 years younger than Guz; and by retaining the two youngest of the six workers at BNI-MI, while terminating the two oldest. This evidence, if presented at trial and accepted by the fact finder would have given rise to a presumption of age discrimination that, if unrebutted by Bechtel, would require entry of judgment for plaintiff. (Hicks, supra, 509 U.S. at p. 507, 113 S.Ct. 2742.)[3]
Bechtel did, however, present rebutting evidence in support of its motion for summary judgment. According to Bechtel, a "downturn in workload" and a desire to save costs prompted its elimination of the BNI-MI unit, where Guz had worked. And it chose the younger workers for the SFRO-MI positions because they were the most qualified for those positions.
Notwithstanding Bechtel's rebuttal evidence, Guz could still prevail at trial under the high court's decision in Reeves by presenting evidence of a prima facie case of age discrimination plus sufficient additional evidence from which a reasonable fact finder could reject "the employer's asserted justification [as] false." (Reeves, supra, 530 U.S. at p. 148, 120 S.Ct. at p. 2109.) As Justice Ginsburg's concurrence in Reeves explained, "two categories" of evidence are needed to support a jury's verdict in a disparate treatment case based on circumstantial evidence of unlawful discrimination: "[F]irst, evidence establishing a `prima facie case,' ...; and second, evidence from which a rational fact finder could conclude that the employer's proffered explanation for its actions was false." (Id. at p. 154, 120 S.Ct. at p. 2112 (cone, opn. of Ginsburg, J.).) Here, in opposing Bechtel's motion for summary judgment, Guz presented evidence in both categories. As discussed earlier, he offered evidence comprising a prima facie case of age discrimination. In addition to the evidence of the prima facie case, he presented this evidence: (1) He was qualified for the SFRO-MI positions filled by other workers; (2) Bechtel never considered him for any of the new positions at SFRO-MI; (3) *401 Bechtel did not comply with its own downsizing policy of ranking employees based on skills and functions; and (4) Bechtel's stated reasons for eliminating BNI-MI cost reduction and downturn in workload were demonstrably false, as noted on page 3, ante. From this additional evidence, a trier of fact could reasonably reject as false Bechtel's asserted business justifications for Guz's discharge. As Justice Ginsburg's concurrence in Reeves noted, "evidence suggesting that a defendant accused of illegal discrimination has chosen to give a false explanation for its actions gives rise to a rational inference that the defendant could be masking its actual, illegal motivation." (Ibid.) Thus, under the high court's standard in Reeves, Guz's evidence here would be sufficient for an appellate court to sustain "a jury's verdict that an employer unlawfully discriminated on the basis of age." (Id. at p. 137, 120 S.Ct. at p. 2103.)
Here, however, we are concerned not with the sufficiency of evidence to sustain a jury verdict of age discrimination, but only with whether Guz's evidence raises "a triable issue of material fact" to be resolved at trial. (Code Civ. Proc., § 437c, subd. (o)(2).) Because, as I have explained, Guz's evidence was sufficient under Reeves not only for a jury to reject Bechtel's proffered reasons for the discharge but also for an appellate court to uphold an age discrimination verdict, that evidence squarely presented "[t]he ultimate question" in any disparate treatment case, namely, "whether the plaintiff was the victim of intentional discrimination." (Reeves, supra, 530 U.S. at p. 153, 120 S.Ct. at p. 2111.) That issue was in this case a material issue of fact in dispute. Therefore, the trial court erred when, in granting summary judgment for Bechtel, it precluded Guz from having the merits of this material issue of fact resolved at a trial.
The majority does not at all acknowledge that Guz's evidence was sufficient to establish a prima facie case of age discrimination.[4] Instead, it looks to a statement by the high court in Reeves that an employer is entitled to judgment as a matter of law when "`no rational fact finder could conclude that the action was discriminatory.' " (Maj. opn., ante, 100 Cal.Rptr.2d at p. 384, 8 P.3d at p. 1118 italics omitted.) According to the majority, that is the case here. I disagree.
In Reeves, the high court explained that notwithstanding evidence comprising a prima facie case of discrimination and sufficient additional evidence for a jury to reject an employer's proffered explanation, the employer would be entitled to a judgment as a matter of law if, for instance, "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." (Reeves, supra, 530 U.S. at p. 148, 120 S.Ct. at p. 2109, italics added.) But here the record does not conclusively reveal Bechtel's true reason for Guz's discharge, and there is insufficient independent evidence that the reason was other than his age. Therefore, contrary to the majority's assertion, this case falls outside the Reeves exception.

*402 CONCLUSION
In a recent decision, I explained the reason for FEHA's prohibition against age discrimination in employment: "Aging is a highly complex and variable process. Chronological age alone is not a reliable measure of any individual's vitality or ability, and many individuals remain robust and productive well past the normal retirement age. Nevertheless, some employers have discriminated against highly qualified older workers solely because of their age, either by not hiring them or by replacing them with younger persons." (Stevenson v. Superior Court, supra, 16 Cal.4th at p. 909, 66 Cal.Rptr.2d 888, 941 P.2d 1157.)
Seeking ever greater efficiency to meet the demands of open market competition, many corporations engage in frequent internal reorganization. As some departments or working groups are reduced or eliminated and others are expanded or created, many employees' jobs are placed at risk in a corporate equivalent of the old game of musical chairs. Because the corporate employer controls the seating assignments, corporate officers who wish to eliminate older workers may use the complexities of the restructuring process to conceal their illegal discriminatory intent. Here, Guz has alleged that he was the victim of exactly this sort of age discrimination by his employer, Bechtel, contrary to the public policy and the law of this state.
Guz's lawsuit against Bechtel is now at the summary judgment stage, where the question to be decided is whether the evidence submitted by Guz and Bechtel shows there is an issue of material fact in dispute that needs to be resolved by a full trial in open court. Unlike the majority, I conclude that the evidence does show a triable issue of fact, and that plaintiff deserves a trial on the merits to determine whether he lost his job for legitimate business reasons or because of illegal age discrimination. Because the majority denies plaintiff the opportunity to prove his case at trial, I dissent.
NOTES
[1] We heard argument in this case on February 8, 2000, and the matter was thereupon submitted. (Cal. Supreme Ct., Internal Operating Practices and Proc., VII A, Submission.) However, on April 14, 2000, we vacated submission in light, of the United States Supreme Court's pending decision in Reeves v. Sanderson Plumbing Products, Inc., No. 99-536,2000 WL 346179 (argued Mar. 21, 2000) (Reeves ), a case presenting issues pertinent to Guz's age discrimination claim. The high court's decision in Reeves was filed on June 12, 2000. (530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105.) The parties were thereupon given the opportunity to brief the significance of Reeves. Having received the parties' briefs, we resubmitted the matter on July 12, 2000.
[2] Such provisions are sometimes referred to as "progressive discipline" policies. We sometimes hereafter use that phrase to describe Bechtel's version.
[3] Throughout the record and briefs, the last name of this individual sometimes is spelled "Sheaffer" and at other times is spelled "Shaeffer." We use the latter spelling.
[4] In his deposition, Johnstone also indicated his understanding of Bechtel's fundamental policies regarding employment security. Johnstone did not believe Bechtel's policy was to terminate employees "arbitrarily and without any reason." On the other hand, Johnstone stated, "I have always known that Bechtel employed peopleyou call it `at will,' I call it we don't guarantee employment to people," meaning that Bechtel works on a "project-by-project basis" and "if the work is not there, the employee does not have the job." Thus, Johnstone understood, Bechtel's policy was to terminate employees when "there was a good reason to do so" or "there was lack of work."
[5] Subsequent references to the Court of Appeal's decision refer to the majority opinion unless the contrary clearly appears.
[6] We note that the California Chamber of Commerce, The Employers Group, and the California Employment Law Council have each filed amicus curiae briefs in support of Bechtel. The American Association of Retired Persons has filed an amicus curiae brief in support of Guz.
[7] Bechtel and one of its amici curiae have questioned whether such traditional standards apply to this case. Bechtel suggests that, to survive summary judgment, Guz had the burden to present evidence of an implied employment security agreement sufficient to overcome the statutory presumption of at-will employment (see discussion, post), and also to establish, under the generally accepted three-step procedure for testing such claims (see discussion, post), a prima facie case of intentional age discrimination. The California Chamber of Commerce argues more broadly that 1992 and 1993 amendments to the California summary judgment statute (Code Civ. Proc., § 437c) adopted then extant federal standards, under which a moving defendant could obtain summary judgment solely by showing, after opportunity for discovery, that the opposing plaintiff had failed to present triable evidence crucial to his case (see Celotex Corp. v. Catrett (1986) 477 U.S. 317, 322-326, 106 S.Ct. 2548, 91 L.Ed.2d 265). We need not belabor these matters. As we explain below, Bechtel did adduce, in support of its motion for summary judgment, affirmative evidence which, unless materially contradicted or rebutted, would establish that each of Guz's causes of action lacked merit. (See Code Civ. Proc., § 437c, subd. (o)(2).) By any interpretation of the summary judgment statute, the burden thereupon shifted to Guz to show the existence of one or more triable issues of material fact (ibid.; see Calvillo-Silva, supra, 19 Cal.4th 714, 735, 80 Cal. Rptr.2d 506, 968 P.2d 65), and, as to each cause of action, Guz did submit or point to evidence which, in his view, indicated such triable issues. Thus, as to each count of Guz's complaint, the issue on appellate review is simply whether, and to what extent, the evidence submitted for and against the motion for summary judgment discloses issues warranting a trial.
[8] As this court has explained, the statutory and common law rule presuming that employment contracts without a stated duration are at will is required by "[s]pecial policy considerations." (Consolidated Theatres, Inc. v. Theatrical Stage Employees Union (1968) 69 Cal.2d 713, 727, fn. 12, 73 Cal.Rptr. 213, 447 P.2d 325.) "`[T]he courts have not deemed it to be their function, in the absence of contractual, statutory or public policy considerations, to compel a person to accept or retain another in his employ, nor to compel any person against his will to remain in the employ of another. Indeed, they have consistently held that in such a confidential relationship, the privilege [to terminate] is absolute, and the presence of ill will or improper motive will not destroy it.' (9 Williston on Contracts [ (3d ed.1957)] § 1017, p. 134.)" (Ibid.)
[9] As noted, Bechtel's disclaimer appears in Policy 1101, part of the general body of Bechtel personnel documents submitted by the parties in connection with the motion for summary judgment. The date on which Policy 1101 was promulgated is uncertain. However, we do not understand Guz to claim that he had an employment security agreement that predated and arose independently of Policy 1101 and therefore could not be rescinded or cancelled by virtue of Policy 1101's belated disclaimer. On the contrary, Guz admits Policy 1101 (necessarily including its disclaimer) applied to him, and he premises his contractual claim on an amalgam of factors, significantly including certain language in Policy 1101 itself. (See discussion herein.) Hence, we may, and do, assume that the disclaimer included in Policy 1101 is a material factor in ascertaining the terms and conditions on which Guz individually was employed by Bechtel.
[10] On the other hand, most cases applying California law, both pre- and post-Foley, have held that an at-will provision in an express written agreement, signed by the employee, cannot be overcome by proof of an implied contrary understanding. (See, e.g., Halvorsen v. Aramark Uniform Services, Inc. (1998) 65 Cal.App.4th 1383, 1387-1389, 77 Cal.Rptr.2d 383; Cruey v. Gannett Co. (1998) 64 Cal. App.4th 356, 362-363, 76 Cal.Rptr.2d 670; Haggard v. Kimberly Quality Care, Inc. (1995) 39 Cal.App.4th 508, 516-522, 46 Cal.Rptr.2d 16; Camp v. Jeffer, Mangels, Butler & Martnaro (1995) 35 Cal.App.4th 620, 629-630, 41 Cal.Rptr.2d 329 (Camp); Tollefson v. Roman Catholic Bishop (1990) 219 Cal.App.3d 843, 849-852, 855-857, 268 Cal.Rptr. 550 (Tollefson); Anderson v. Savin Corp. (1988) 206 Cal.App.3d 356, 360, 363-364, 254 Cal.Rptr. 627; Gerdlund v. Electronic Dispensers International (1987) 190 Cal.App.3d 263, 267-268, 270-276, 235 Cal.Rptr. 279; Malmstrom v. Kaiser Aluminum & Chemical Corp. (1986) 187 Cal.App.3d 299, 309, 313-318, 231 Cal. Rptr. 820; Shapiro v. Wells Fargo Realty Advisors (1984) 152 Cal.App.3d 467, 473, fn. 1, 482, 199 Cal.Rptr. 613; Gianaculas v. Trans World Airlines, Inc. (9th Cir. 1985) 761 F.2d 1391, 1394; Baker v. Kaiser Aluminum & Chemical Corp. (N.D.Cal.1984) 608 F.Supp. 1315, 1320-1321; Crain v. Burroughs Corp. (C.D.Cal.1983) 560 F.Supp. 849, 851-852; Crossen v. Foremost-McKesson, Inc. (N.D.Cal. 1982) 537 F.Supp. 1076, 1077; but see, e.g., Esbensen v. Userware Intemat., Inc. (1992) 11 Cal.App.4th 631, 640-641, 14 Cal.Rptr.2d 93; Seubert v. McKesson Corp. (1990) 223 Cal. App.3d 1514, 1519-1520, 273 Cal.Rptr. 296; Wallis v. Farmers Group, Inc. (1990) 220 Cal. App.3d 718, 730-731, 269 Cal.Rptr. 299; McLain v. Great American Ins. Companies (1989) 208 Cal.App.3d 1476, 1485-1486, 256 Cal.Rptr. 863; Brawthen v. H & R Block, Inc. (1972) 28 Cal.App.3d 131, 138-139, 104 Cal. Rptr. 486.)
[11] Of course, the more clear, prominent, complete, consistent, and all-encompassing the disclaimer language set forth in handbooks, policy manuals, and memoranda disseminated to employees, the greater the likelihood that workers could not form any reasonable contrary understanding. Though we do not find such clarity in the disclaimer language of Policy 1101 (see discussion, post), we do not foreclose the possibility an employer could promulgate a disclaimer clause which established beyond contrary inference that the employer intended employment to be at will.
[12] Bechtel presented evidence that between 1982 and 1995, its overall work force was reduced from 44,000 to 16,000 employees.
[13] As support for this statement, Foley cited, with a "cf." signal, Gray v. Superior Court (1986) 181 Cal.App.3d 813, 821, 226 Cal.Rptr. 570 (Gray) and Khanna v. Microdata Corp. (1985) 170 Cal.App.3d 250, 262, 215 Cal.Rptr. 860 (Khanna). Significantly, both Gray and Khanna, insofar as they found that length of service alone could strengthen a cause of action for wrongful termination, had relied on the Cleary theory, elsewhere rejected in Foley, that the arbitrary dismissal of a longtime employee is a breach of the covenant of good faith and fair dealing regardless of the terms of the employment agreement. (Grav, supra, 181 Cal.App.3d 813, 820-821, 226 Cal.Rptr. 570; Khanna, supra, 170 Cal.App.3d 250, 262-263, 215 Cal.Rptr. 860.)
[14] Policy 1101 itself distinguished between the rights of senior and junior employees in one regard only. Thus, in the event of a reduction in force, employees with 10 or more years of continuous service, such as Guz, were entitled to at least four weeks' advance notice of layoff, while those with less than 10 years of service were entitled to as little as two weeks' layoff notice. Salary in lieu of the requisite advance notice was available in certain circumstances. The RIF Guidelines, which described the specific procedures to be employed during a work force reduction, echoed this disparity in notice rights. They further encouraged managers to give "as much informal notice as possible, particularly for long-term employees." Finally, the RIF Guidelines provided that while seniority and experience "often represent a major company strength," "[s]eniority, per se, is not a criterion] used in selecting candidates for layoff or retention over other employees." (Italics added.) All these provisions strongly reinforce the inference that seniority provided no special immunity against layoff.
[15] Because the record negates any inference of an implied contract restricting Bechtel's right to implement work force reductions for any reason, we need not, and do not, decide what would satisfy a company's implied-in-fact contractual obligation to demonstrate good cause for such a decision.
[16] As noted above, the trial court granted summary judgment against all causes of action, including Guz's cause of action alleging breach of the implied covenant of good faith. The Court of Appeal reinstated the implied covenant claim for trial on the sole ground that Bechtel had waived any objection by making arguments on appeal that were different from those it had raised in the trial court. Guz asserts that we should leave the Court of Appeal's judgment undisturbed, still without addressing Bechtel's objections, because the arguments Bechtel now makes are not the same as those it raised in the Court of Appeal. (See Cal. Rules of Court, rule 29(b)(1).) Under the present unusual circumstances, we deem it appropriate to address Bechtel's implied covenant arguments.

In the trial court, Bechtel urged that (1) the implied covenant imposes no independent limits on an employer's termination rights, and (2) in any event, there is no evidence Bechtel acted in bad faith. In the Court of Appeal, appellant Guz asserted that Bechtel breached the implied covenant by violating its personnel policies even if Guz was an at-will employee. Bechtel responded only that it did not act in bad faith. The Court of Appeal, mistakenly asserting that Bechtel had not raised the bad faith argument below, concluded that Bechtel's "change of theory" on appeal waived its challenge to the implied covenant claim. The Court of Appeal reinstated all causes of action, including that alleging a breach of the implied covenant. In its rehearing petition, Bechtel did not call the Court of Appeal's waiver error to its attention. (See Cal. Rules of Court, rule 29(b)(2).)
We did not limit the issues on review. Bechtel's brief on the merits in this court contends that the trial court properly dismissed the implied covenant cause of action. Before us, Bechtel makes both of the arguments it made in the trial court, including the "no independent limits" argument it did not raise in the Court of Appeal.
We might properly avoid the implied covenant issue on this muddled record. However, there appear several reasons not to do so. First, the "independent limits" issue was before the Court of Appeal by virtue of appellant Guz's brief, and the Court of Appeal's waiver analysis is highly suspect. Second, even though Bechtel did not fully litigate the implied covenant issue in the Court of Appeal, the matter is now fully briefed, squarely presented, and of substantial significance. Finally, and significantly, there seems little merit in allowing the reinstatement of a spurious cause of actionthe result imposed by the Court of Appealon grounds that the defendant has waived, in the appellate courts, an issue on which it properly succeeded in the trial court. We therefore address the implied covenant issue on its merits.
[17] We are not persuaded otherwise by a brief dictum in Scott, supra, 11 Cal.4th 454, 46 Cal.Rptr.2d 427, 904 P.2d 834. There, the jury found the employer had breached an implied-in-fact contract not to demote without good cause; the issue before us in Scott was whether such a contract was enforceable. We answered that question in the affirmative, and we found ample evidence to support the jury's breach-of-contract verdict. In a foot-note, we observed that the jury had also reached a plaintiff's verdict on the separate cause of action for breach of the implied covenant of good faith and fair dealing, but we declined to address that claim. We remarked: "Since breach of the implied-in-law covenant of good faith claim is basically a contract claim (Foley, supra, 47 Cal.3d [654,] 700, 254 Cal.Rptr. 211, 765 P.2d 373), the former claim only becomes an issue when there is insufficient evidence to find an implied-in-fact contract not to terminate or demote. In this case, we are not called on to decide what independent significance a good faith covenant claim may have, since the jury found that there was an implied-in-fact contract not to demote." (Scott, supra, 11 Cal.4th at p. 462, fn. 2, 46 Cal.Rptr.2d 427, 904 P.2d 834, italics added.) Thus, Scott expressly declined to resolve what "independent significance" an implied covenant claim may have. Moreover, to the extent Scott hinted that the implied covenant may have independent significance in cases where there is insufficient evidence of an implied-in-fact contract, the suggestion contravenes the persuasive reasoning of Foley.
[18] We do not suggest the covenant of good faith and fair dealing has no function whatever in the interpretation and enforcement of employment contracts. As indicated above, the covenant prevents a party from acting in bad faith to frustrate the contract's actual benefits. Thus, for example, the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned. We confront no such claim here.
[19] As pertinent here, the FEHA makes it "an unlawful employment practice for an employer to refuse to hire or employ, or to discharge, dismiss, reduce, suspend, or demote, any individual over the age of 40 on the ground of age...." (Gov.Code, § 12941, subd. (a).)
[20] "Disparate treatment" is intentional discrimination against one or more persons on prohibited grounds. (E.g., Teamsters v. United States (1977) 431 U.S. 324, 335-336, fn. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (Teamsters); Mixon, supra, 192 Cal.App.3d 1306, 1317, 237 Cal.Rptr. 884.) Prohibited discrimination may also be found on a theory of "disparate impact," i.e., that regardless of motive, a facially neutral employer practice or policy, bearing no manifest relationship to job requirements, in fact had a disproportionate adverse effect on members of the protected class. (E.g., Griggs v. Duke Power Co. (1971) 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158; City and County of San Francisco v. Fair Employment & Housing Com. (1987) 191 Cal. App.3d 976, 985-986, 236 Cal.Rptr. 716.) Here, the parties frame the issue as one of disparate treatment.
[21] For example, in the seminal case of McDonnell Douglas, the court found that one rejected for a job opening could establish a prima facie case of race discrimination by showing that (1) he or she was a member of a racial minority, (2) he or she applied and was qualified for an available job, (3) he or she was rejected, and (4) the position thereafter remained open and the employer continued to seek applications from persons with similar qualifications. (McDonnell Douglas, supra, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668.)
[22] At least one federal case has criticized and rejected a test dependent upon the employers mere "honest belief," holding instead that the employer's reasons must stem from its actual consideration of "particularized facts." (Smith v. Chrysler Corp. (6th Cir. 1998) 155 F.3d 799, 806 (Smith).) However, Smith's holding should be viewed in light of the facts of that case. There, the employer fired an employee, who had a narcoleptic condition, for failing to disclose this condition on his employment application. The employer apparently assumed on stereotypical grounds, without individualized investigation, that the condition might affect the employee's job performance. Thus, in the employee's suit for discrimination in violation of the Americans with Disabilities Act, the employer's reasons were not unrelated on their face to the prohibited form of bias. Smith is not persuasive when the employer's proffered reasons are manifestly unconnected to the form of discrimination alleged.
[23] Thus, Tevis explained, Goldstein "was always saying that Guz needed to get his computer training because he couldn't operate the computer." Tevis understood from Goldstein that Guz's lack of computer skills at BNI-MI had forced Goldstein to "have an extra person in."
[24] See, e.g., Horn, supra, 72 Cal.App.4th 798. 806-807, 85 Cal.Rptr.2d 459; Martin, supra, 29 Cal.App.4th 1718, 1735, 35 Cal.Rptr.2d 181; University of Southern California, supra, 222 Cal.App.3d 1028, 1039, 272 Cal.Rptr. 264; Richter v. Hook-SupeRx, Inc. (7th Cir. 1998) 142 F.3d 1024, 1029 (Richter); Model v. FCI Marketing, Inc. (8th Cir.1997) 116 F.3d 1247, 1251; Nidds, supra, 113 F.3d 912, 918; E.E.O.C. v. Texas Instruments, Inc. (5th Cir. 1996) 100 F.3d 1173, 1181; Sheridan v. E.I. DuPont de Nemours and Co. (3d Cir. 1996) 100 F.3d 1061, 1067; Stults v. Conoco, Inc. (5th Cir. 1996) 76 F.3d 651, 657; Landon v. Northwest Airlines, Inc. (8th Cir. 1995) 72 F.3d 620, 624; Medina-Munoz v. R.J. Reynolds Tobacco Co. (1st Cir. 1990) 896 F.2d 5; `Steckl v. Motorola, Inc. (9th Cir. 1983) 703 F.2d 392, 393; Hersant, supra, 57 Cal.App.4th 997, 1004, 67 Cal.Rptr.2d 483; Addy v. Bliss & Glennon, supra, 44 Cal.App.4th 205, 215-216, 51 Cal. Rptr.2d 642; but see Aka v. Washington Hasp. Center (D.C.Cir.1998) 332 App.D.C. 256, 156 F.3d 1284, 1289, footnote 4; Hairston v. Gainesville Sun Pub. Co. (11th Cir. 1993) 9 F.3d 913, 919-921; Green v. Rancho Santa Margarita Mortgage Co. (1994) 28 Cal.App.4th 686, 694-696, 33 Cal.Rptr.2d 706.
[25] The concurring and dissenting opinion, in its treatment of this passage (see cone. & dis. opn. of Kennard, J., post, 100 Cal.Rptr.2d at at pp. 361-362, 8 P.3d at pp. 1097-1098), minimizes the express qualifying phrase "[f]or instance" and overlooks the immediately following discussion, which specifies that the propriety of judgment as a matter of law depends on "a number of factors," including, among other things, "the strength of the plaintiff's prima facie case." (Reeves, supra, 530 U.S. 133, 148-149, 120 S.Ct. 2097, 2109.) As the concurring and dissenting opinion must concede, Reeves makes clear that a rational inference of discrimination does not necessarily arise even where "the plaintiff has established a [technically sufficient] prima facie case and [has] set forth sufficient evidence to reject the defendant's explanation." (Ibid., italics added.) Here, as will appear, Guz's circumstantial evidence of intentional discrimination, even if fully credited and technically sufficient to establish a prima facie case, raises, at most, a weak inference of prohibited bias. Moreover, the concurring and dissenting opinion does not dispute that Guz's responses to discovery largely conceded the truth of Bechtel's nondiscriminatory explanations for its actions. (See discussions post.) Under such circumstances, Reeves supports our conclusion that the evidence, viewed as a whole, does not give rise to a rational inference of discrimination.
[26] Aside from his responses to the Undisputed Fact Statement, Guz has separately acknowledged the truth of Bechtel's claim that unit performance was a major factor in Johnstone's decision to eliminate BNI-MI. Guz has cited Johnstone's testimony to that effect in aid of his claim that Bechtel breached its implied contractual obligations by failing to apply its written progressive discipline rules before terminating the BNI-MI group for performance reasons. (See discussion, ante)
[27] The concurring and dissenting opinion suggests Bechtel's "cost savings" excuse is suspect because Bechtel created five new SFRO-MI positions to replace only six eliminated BNI-MI positions. (Cone. & dis. opn. of Kennard, J., post, 100 Cal.Rptr.2d at p. 397, 8 P.3d at p. 1130.) However, as indicated above, SFRO-MI gained only three new positions attributable to work formerly done by the six members of BNI-MI. Former BNMI members Wraith and Siu were added to SFRO-MI's staff to do BNI-related work, and SFRO-MI member Wallace was appointed to a new position supervising SFRO-MI's new relationship with BNI. But Jan Vreim, Wallace's former SFRO-MI subordinate, was simply promoted to Wallace's old position, and Barbara Stenho was appointed to an existing SFRO-MI job, formerly held by Robert Luchini, that had nothing to do with BNI. (See discussion, ante.)
[28] Thus, if Bechtel, when eliminating BNMI, had made only one different personnel decision, i.e., had retained BNI-MI's manager, Goldstein, age 50, and had laid off the 34year-old Siu, the effect on Guz would be unchanged, but the statistics would indicate that Bechtel had favored workers over 40. Similarly, if SFRO-MI's manager, Tevis, had made only one different personnel decision when filling the three later open positions, so that two of the three, rather than only one of the three, were filled by persons older than Guz, Guz would have no statistical claim that Bechtel's failure to consider him for those jobs was the result of age discrimination.
[29] In his deposition, James Tevis indicated that the SFRO-MI position for which Christine Siu was hired was a junior one, commensurate with her salary grade, three steps lower than Guz's. Tevis conceded he considered Siu's salary level in selecting her for the job. Before 1999, both state and federal decisions had rejected the premise that prohibited age discrimination may be shown solely by evidence that the employer's actions were taken for economic reasons often related to worker age, such as comparative salaries. (Hazen Paper Co. v. Biggins (1993) 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 [firing of longterm employee to prevent imminent vesting of pension rights did not violate federal age discrimination law]; Marks v. Loral Corp. (1997) 57 Cal.App.4th 30, 42-64, 68 Cal.Rptr.2d 1 [cost- or compensation-based personnel decisions which tend to disfavor higher paid older workers are no basis for claim of "disparate impact" age discrimination under either state or federal statutes].) In 1999, however, the Legislature amended the FEHA to overrule Marks. (Gov.Code, § 12941.1, added by Stats. 1999, ch. 222, § 2.) The new statute declares that Marks "does not affect existing law" governing state age discrimination claims, and states the Legislature's "intent that the use of salary as the basis for differentiating between employees when terminating employment may be found to constitute age discrimination if use of that criterion adversely impacts older workers as a group." (Gov. Code, § 12941.1, italics added.) Guz has occasionally insinuated that Bechtel's decisions, particularly the elimination of BNI-MI and the retention of Siu, were discriminatory efforts to reduce salaries by releasing higherpaid older workers. However, Guz has never made a developed claim to that effect, and he has never cited section 12941.1. In any event, while Bechtel concedes that Johnstone sought to save costs by eliminating BNI-MI, any evidence that the motive was to eliminate senior salaries is no greater or different than the evidence that the decision disfavored older workers directly. Nor did Tevis's decision to select one junior employee, Siu, for a junior position have a disparate impact on older workers as a group.
[1] Much of the concurring and dissenting opinion is irrelevant to the majority's holding. The majority does not suggest that age discrimination is lawful; it clearly is not. (Gov. Code, § 12941, subd. (a); see maj. opn., ante, 100 Cal.Rptr.2d at p. 377, fn. 19, 8 P.3d at p. 1112, fn. 19.) The majority merely holds that the evidence in this case does not suggest Bechtel engaged in age discrimination. For example, the discussion of Marks v. Loral Corp. (1997) 57 Cal.App.4th 30, 68 Cal. Rptr.2d 1 (cone. & dis. Opn., post, at p. 399, 8 P.3d at p. 1131) is utterly irrelevant. Bechtel never asserted a right to discharge older workers in favor of lower-salaried younger workers to save salaries.
[2] Contrary to the implication of the concurring and dissenting opinion (cone. & dis. opn. of Kennard, J., post, 100 Cal.Rptr.2d at pp. 401-402, fn. 4, 8 P.3d at pp. 1133-1134), I do not suggest evidence of age discrimination must be direct rather than circumstantial. My point is that Guz has presented no meaningful evidence whatsoever, direct or circumstantial, suggesting age discrimination.
[1] Further undesignated statutory references are to the Government Code.
[2] I do not agree with Justice Chin's concurring opinion that Marks v. Loral Corp., supra, 57 Cal.App.4th 30, 68 Cal.Rptr.2d 1, is "utterly irrelevant" to the issues here. (Cone. opn. of Chin, J., ante, 100 Cal.Rptr.2d at p. 392, fn. 1, 8 P.3d at p. 1125, fn.1.) The younger workers that Bechtel chose to retain earned lower salaries than Guz, and the Legislature's recent clarification of the law on this point serves to explain why Bechtel has not and could not lawfully rely on the resulting salary savings to justify its decision, as other employers in the past have done.

Justice Chin's concurring opinion also complains that this opinion's discussion of the illegality of age discrimination "is irrelevant to the majority's holding" because "[t]he majority does not suggest that age discrimination is lawful." (Cone. opn. of Chin, J, ante, at p. 392, fn. 1,8 P.3d at p. 1125, fn. 1.) Surely the illegality of age discrimination cannot be entirely irrelevant in an age discrimination case. The nature and purpose of the prohibition against age discrimination in employment should be kept in mind when assessing the sufficiency of the evidence and the allocation of the proof burdens on a summary judgment motion in an age discrimination case.
[3] Because I conclude that plaintiff's evidence here was sufficient for a prima facie case of age discrimination, I express no view on whether a plaintiff suing under the FEHA can successfully avoid summary judgment without such evidence. (See maj. opn., ante, 100 Cal. Rptr.2d at p. 380, 8 P.3d at p. 1115 [also declining to decide this issue].)
[4] Justice Chin's concurring opinion asserts that "Guz cannot state a prima facie case." (Cone. opn. of Chin, J., ante, 100 Cal.Rptr.2d at p. 393, 8 P.3d at p. 1126.) It finds some significance in Guz's failure to point to "comments by anyone" at Bechtel suggesting that his age played a role in Bechtel's employment decisions. (Ibid.) But such evidence of discriminatory intent is unnecessary either to allege or to prove age discrimination based on disparate treatment, plaintiff's theory in this case. Rather, as the high court in Reeves has said, an employee claiming disparate treatment can rely entirely on circumstantial evidence, which may be probative of intentional discrimination and "quite persuasive." (Reeves, supra, 530 U.S. at pp. 146-147, 120 S.Ct. at p. 2108.) That, as I have explained, is the case here.